Henry **HARRIS** and Johnnie C. **Hillman,** on behalf of themselves and all others similarly situated,

and

**Equal Employment Opportunity Commission**

v.

**ANACONDA ALUMINUM COMPANY,** Shopmen's Local Union No. 616 of the International Association of Bridge, Structural & Ornamental Iron Workers, International Association of Bridge, Structural & Ornamental Iron Workers, AFL–CIO.

**Civ. A. No. C75–289A.**

United States District Court, N. D. Georgia, Atlanta Division.

March 30, 1979.

**16**

ORDER

NEWELL EDENFIELD, District Judge.

This civil action, alleging racial discrimination in employment, is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.*, Section 1 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Labor Management Relations Act, 29 U.S.C. §§ 151, *et seq.*, with respect to the plaintiffs' claim for alleged violations of the duty of fair representation by the defendant unions. The two individual plaintiffs, Henry Harris and Johnnie C. Hillman, are black hourly employees at defendant Anaconda Company's (hereinafter "Anaconda") facility in Fulton County, Georgia and members of defendant Shopmen's Local Union No. 616 (hereinafter "Local Union"). They filed their original EEOC charges of racial discrimination against Anaconda and the Local Union on April 18, 1969. On July 20, 1970, plaintiffs filed substantially identical EEOC charges against defendant International Association of Bridge, Structural and Ornamental Iron Workers (hereinafter "International Union"). The Equal Employment Opportunity Commission (hereinafter "Commission") rendered its reasonable cause determination on February 6, 1973 and attempted to conciliate the matter until July 19, 1974. No conciliation agreement having been reached, plaintiffs received their notice of right to sue on November 11, 1974 and filed the instant action seeking declaratory and injunctive relief on February 19, 1975. They allege, on behalf of a class of similarly situated individuals, that Anaconda has discriminated against them because of their race in promotions and transfers, job assignments, training opportunities, and other terms and conditions of employment and that the unions have discriminated against Anaconda's black employees by limiting the employment and promotional opportunities of these persons and by breaching the duty fairly to represent those employees. The Commission was permitted to intervene in this action, pursuant to sections 705(g)(6) and 706(f)(1)

Donald P. Edwards of Kennedy & Sampson, Atlanta, Ga., for plaintiffs.

Abner W. Sibal, Gen. Counsel, E.E.O.C., William L. Robinson, Assoc. Gen. Counsel, E.E.O.C., Washington, D. C., Theodore T. Grove and Floyd C. Hale, Trial Attys., E.E.O.C., Atlanta, Ga., for E.E.O.C.

Harris Jacobs and James T. Langford of Jacobs, Jacobs & Davis, Atlanta, Ga. (for Unions—local and intl.)

Cleburne E. Gregory, Jr., Jeffrey B. Berg and Simon A. Miller, Atlanta, Ga. (for Anaconda).

of Title VII, 42 U.S.C. §§ 2000e–4(g)(6), –5(f)(1), on September 15, 1976.

By order of March 31, 1978, the court granted motions by the private plaintiffs and the Commission for class certification, the class to include all past, present and future black employees at Anaconda's Fulton County facilities after July 2, 1965. At this time, it designated the Commission as the class representative but amended this order on July 21, 1978, to permit both the individual plaintiffs and the Commission to represent the class. The March order also granted the Commission's motion to separate the issues of liability and individual relief for purposes of trial. The liability portion of this case was tried to the court, sitting without a jury, from July 10, 1978 through July 27, 1978 and from August 21, 1978 through August 24, 1978, and all five parties presented witnesses and documentary evidence in support of their positions. This order contains the court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

*Jurisdiction*

Anaconda is and has been a business corporation engaged in designing and manufacturing architectural aluminum products in Fulton County and in selling and shipping those products to customers in various other places both inside and outside the United States. It has continuously employed several hundred persons in those operations since prior to July 2, 1965, the effective date of Title VII, and is therefore an employer engaged in an industry affecting commerce within the meaning of section 701(b), (g) and (h) of Title VII, 42 U.S.C. § 2000e–1(b), (g) and (h). The Local Union has been an unincorporated association of participating employees which deals with employers concerning terms and conditions of employment continuously since July 2, 1965. It has had more than twenty-five members and has been the certified collective bargaining representative of several hundred of the Anaconda employees since before that date. The International Union chartered the Local Union, has had more than twenty-five members, and has been an unincorporated association of participating employees which deals with employers concerning terms and conditions of employment continuously since July 2, 1965. Both the Local and International Unions are labor organizations engaged in an industry affecting commerce within the meaning of section 701(d) and (e) of Title VII, 42 U.S.C. § 2000e–1(d) and (e). The court has jurisdiction of this action under section 706(f) of Title VII, 42 U.S.C. § 2000e–5(f), and under 28 U.S.C. §§ 1343, 1345, 2201 and 2202 and 29 U.S.C. §§ 151, *et seq.*

*Statute of Limitations*

In *United Air Lines v. Evans*, 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977), the Supreme Court held:

A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute [Title VII] was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.

Plaintiff in *Evans* had been forced to resign in 1968 because of a marriage policy discriminating against female flight attendants. She did not file an EEOC charge within ninety days as required by Title VII prior to 1972. After reinstatement in 1972 plaintiff filed suit to receive seniority credit for the pre-1968 employment, contending that the seniority system perpetuated an act of past discrimination. In upholding the dismissal of this complaint as time-barred, the Court rejected plaintiff's theory that the refusal to grant her seniority credit constituted a continuing violation having present effects, on two separate grounds. First, a post-1965 unlawful practice which is not made the basis of a timely EEOC charge is the legal equivalent of a pre-1965 act and has no present legal effects. Second, under section 703(h) a neutral seniority system may not be attacked under Title VII because of "the mere fact that a past event which has no present legal significance has affected the calculation of

seniority credit, even if the past event might at one time have justified a valid claim against the employer." 431 U.S. at 560, 97 S.Ct. at 1890.

■ *Evans* was an individual action, while the present case is a class action. "In a class action, the named plaintiffs can represent all persons who could have filed charges with the Equal Employment Opportunity Commission . . . as of the effective date of a class representative's filing." *Dickerson v. United States Steel Corp.,* 439 F.Supp. 55, 68 (E.D.Pa.1977), *rev'd on other grounds,* 582 F.2d 827 (3d Cir. 1978), *citing Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 246 (3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). Thus, the class can only assert liability against defendants by showing violations with respect to which EEOC charges could have been filed at the same time the named plaintiffs filed their EEOC charges. *Croker v. Boeing Co.,* 437 F.Supp. 1138 (E.D.Pa.1977).

■ The effect of *Evans* is that liability under Title VII cannot be predicated upon either pre-Act discrimination or post-Act discrimination which has not been made the subject of a timely EEOC charge. *See Swint v. Pullman-Standard,* 15 F.E.P. 144 (N.D.Ala.1977). Such post-Act discrimination is, of course, admissible background evidence which may be circumstantially relevant to establishing current unlawful practices, but, standing alone, it cannot support a finding of liability. In the present case, the cut-off date under *Evans* is January 18, 1969, which is ninety days prior to the filing of the original EEOC charges against Anaconda and the Local Union. Thus, any evidence of alleged unlawful acts prior to that date cannot be evidence of a pattern or practice upon which a finding of liability against these two parties may be predicated. Since the charges against the International Union were not filed until July 20, 1970, its Title VII liability must be based upon discriminatory acts occurring after April 21, 1970.

■ Plaintiffs and the Commission argue that the statute of limitations delineated in *Evans* does not apply in cases alleging "a broad systematic pattern of racial discrimination in promotions" since such cases involve, by definition, continuing violations of Title VII in that black employees continue to feel the effects of the alleged discrimination in terms of wages or benefits. They assert that in these cases no limitation period other than the effective date of the statute should be applied. It appears to the court that *Evans* itself spoke to this question and made no such distinction. The Court stated, "Respondent emphasizes the fact that she has alleged a *continuing* violation. United's seniority system does indeed have a continuing impact on her pay and fringe benefits. But the emphasis should not be placed on mere continuity; the critical question is whether any present *violation* exists." 431 U.S. at 558, 97 S.Ct. at 1889. In *DuPree v. E. J. Brach & Sons,* 77 F.R.D. 3, 6 (N.D.Ill.1977), a case involving allegedly discriminatory promotions, the court relied upon this language and rejected a continuing violation theory. It reasoned, "[T]he alleged denials of promotions here have a constant and present effect. The *violations* occurred, if at all, when the defendant allegedly promoted white, less qualified individuals over blacks." The court concludes that this is the proper approach after *Evans.*

*Clark v. OlinKraft, Inc.,* 556 F.2d 1219 (5th Cir. 1977), is cited by plaintiffs[1] in support of their continuing violation theory. It does not appear to assist them, however. There, a female worker, who had been employed by defendant from March, 1964 until October, 1974 without being promoted, alleged that her employer had an established policy or practice of promoting men with less seniority to better-paying jobs over qualified women and of paying women lower salaries than men performing the same job. The district court granted defendant's motion to dismiss the complaint, treated as one for summary judgment, on the basis

---

1. The word "plaintiffs" will be used to refer to the individual plaintiffs, the Commission, and the class and does not refer solely to the individual plaintiffs.

that all of the events alleged in the complaint had occurred more than 180 days prior to plaintiff's March 5, 1975 filing of her EEOC charge. The Fifth Circuit reversed and set forth two theories in support of its action: (i) a continuing violation theory relying on *Evans v. United Airlines*, 534 F.2d 1247 (7th Cir. 1976), as it existed prior to its reversal by the Supreme Court and (ii) the existence of a factual dispute concerning the active discrimination that occurred within 180 days prior to the filing of the EEOC charge, which dispute rendered a grant of summary judgment improper. The court explicitly based its opinion on the second ground, however. Footnote 7 provides:

> While this opinion was being circulated, the Supreme Court reached a decision in *Evans . . .* reversing the Court of Appeals. As already noted, our decision in the instant case does not depend on the validity of the theory asserted in *Evans*.

And further, in footnote 9, the court stated:

> Our disagreement with the views expressed in the dissent is based on the fact that the allegations in the complaint and the deposition created an issue of fact relating to present discrimination. Summary judgment is an inappropriate vehicle for deciding factual questions, and it is on this basis that we reverse.

The dissent points out that under *Evans* an employer may treat as lawful any allegedly discriminatory act committed more than 180 days prior to the filing of the [post-1972] charge, although such conduct may be relevant as background evidence in a proceeding in which the status of a current practice is an issue, and that the critical question in such cases is "whether any present violation exists," 556 F.2d at 1224. It also argued that the record established there was no present violation. By making clear that its disagreement with the dissent was solely on the summary judgment issue, the court in effect rejected the continuing violation theory which it discussed in its opinion, as the Supreme Court opinion in *Evans*, of course, required it to do. Therefore, *Clark* is actually support for the proposition that events occurring prior to the relevant limitation period for filing an EEOC charge do not constitute conduct actionable under Title VII.

■ The individual plaintiffs also contend that the limitations period for equitable relief under 42 U.S.C. § 1981 goes back to 1955, twenty years prior to the filing of the complaint. In *United States v. Georgia Power Co.*, 474 F.2d 906 (5th Cir. 1973), and *Franks v. Bowman Transportation Co.*, 495 F.2d 398 (5th Cir. 1974), *rev'd on other grounds*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), the Fifth Circuit held that Ga.Code Ann. § 3–704 is the appropriate statute of limitations for section 1981 actions under the "borrowing" principles of *Beard v. Stephens*, 372 F.2d 685 (5th Cir. 1967). That section provides a limitation period of twenty years for causes of action seeking "the enforcement of rights [accruing to individuals] under statutes" except that awards of back pay are limited to two years. The application of this provision appears to have been somewhat inconsistent, however. In *Ivey v. Western Electric Co.*, 11 E.P.D. ¶ 10,900 (N.D.Ga.1975) (Moye, J.), the court construed *Georgia Power* and *Franks* to apply a bifurcated statute of limitations for section 1981: two years for back pay, and twenty years for equitable relief. Other cases have held that only the two-year provision of section 3–704 was applicable. *See, e. g., Foster v. Mead Packing Intl.*, 14 F.E.P. 348 (N.D.Ga.1976); *Williams v. Burns Intl. Security Services*, 13 F.E.P. 1505 (S.D.Ga.1976); *Collier v. Hunt-Wesson Foods, Inc.*, 13 F.E.P. 88 (S.D.Ga.1976); *Roberts v. H. W. Ivey Construction Co.*, 408 F.Supp. 622 (N.D.Ga.1975).

Having carefully reviewed these decisions, the court concludes that the bifurcated approach of *Ivey* is most appropriate in the instant case in which back pay and other forms of equitable relief are sought. This does not end the matter, however. As stated in *Franks*:

> The § 1981 action, insofar as it corresponds to the Title VII action, must also be considered essentially equitable. In an equitable action, equitable defenses may

be raised, and these include the doctrine of laches. In the proper case, laches might be applied to bar a claim entirely, or it might bar only part of the remedy sought, such as the back pay award for a portion of it.

495 F.2d at 406. In *Ivey*, the court specifically recognized that "laches may very well limit the 20-year limitations period for equitable relief." 11 E.P.D. at 7787.

■■ Laches, a doctrine grounded upon the inequity of permitting enforcement of a claim where some change in circumstances has taken place which would make enforcement unjust, *Davis v. Alabama Power Co.*, 383 F.Supp. 880, 894 (N.D.Ala.1974), *aff'd*, 535 F.2d 657 (5th Cir. 1976), *aff'd*, 431 U.S. 581, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977), is comprised of two elements: inexcusable delay by a plaintiff in asserting his rights and undue prejudice to defendant as a result. *Akers v. State Marine Line, Inc.*, 344 F.2d 217 (5th Cir. 1965). The existence of the defense is addressed to the discretion of the trial court. *Gardner v. Panama R.R.*, 342 U.S. 29, 30, 72 S.Ct. 12, 96 L.Ed. 31 (1951).

■ Both of the elements of laches are present in the instant action. Although at trial witnesses for plaintiffs testified concerning events occurring as far back as 1955, Anaconda had not been made aware of race-based complaints by plaintiffs until they filed their EEOC charges in 1969. Moreover, even though the limitations period for section 1981 was not tolled by the filing of these charges, *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), plaintiffs waited for six years to file their claim under this section. The evidence at trial revealed that bid lists—critical documents in a "promotions" case—do not exist for dates prior to 1968, and there were many instances in which Anaconda's supervisors could not recall incidents in question, a number of which occurred between fifteen and twenty years ago. Thus, concluding that plaintiffs have "slept on [their] Section 1981 rights," *Johnson, supra*, at 466, 95 S.Ct. at 1723, and that defendants were prejudiced in attempting to defend against these old allega-

tions, the court grants Anaconda's laches defense in part. The limitations period for purposes of equitable relief under section 1981 shall be the same as that established for the Title VII claims—January 18, 1969. For back pay relief under this section, of course, the two-year limitation will control.

As noted earlier, plaintiffs Harris, Hillman, and the Commission represent a class which has been defined to include "all present, former, and future black employees of the defendant company who are, have been or will be employed at defendant's facilities in Fulton County, Georgia after July 2, 1965. On the basis of the foregoing discussion on the applicable statutes of limitation, this description will be amended to read "after January 18, 1969."

*Standard and Methods of Proof*

■ This case arises under section 706 of Title VII, 42 U.S.C. § 2000e–5. Both plaintiffs and the Commission have alleged broad systemwide patterns of discrimination against a class of black employees; they have offered individual testimony, documentary evidence and statistics in support of their claims. Plaintiffs bear "the initial burden of making out a prima facie case of discrimination," *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 1855, 52 L.Ed.2d 396 (1977), and may accomplish this by demonstrating either disparate treatment or disparate impact. In *Teamsters, supra*, at 335, n. 15, 97 S.Ct. at 1854, n. 15, these terms were defined as follows:

"Disparate treatment" . . . is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. [Citation omitted.] Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.
. . .

Claims of disparate treatment may be distinguished from claims that stress

"disparate impact." The latter involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity. . . . Proof of discriminatory motive, we have held, is not required under a disparate impact theory.

If the plaintiffs meet their initial burden, the burden then shifts to the employer to defeat the inference which plaintiffs have raised by exposing plaintiffs' proof as insignificant or inaccurate or by proving a business necessity. Plaintiffs are then permitted to put on rebuttal evidence to overcome defendant's proof.

The *Teamsters* court described plaintiffs' ultimate burden of proof in this situation in the following terms:

[The party alleging a systemwide pattern] ultimately had to prove more than the mere occurrence of isolated or "accidental" or sporadic discriminatory acts. [Such a party] had to establish by a preponderance of the evidence that racial discrimination was the company's standard operating procedure—the regular rather than the unusual practice.[2]

431 U.S. at 336, 97 S.Ct. at 1855. This court must determine whether the plaintiffs and Commission have met their burden of proving a "pattern or practice" of racial discrimination, upon consideration of the plaintiffs' and Commission's evidence in chief, the rebuttal and defensive evidence presented by the three defendants, and the rebuttal evidence presented by the plaintiffs. *See, e. g., United States v. United States Steel Corp.,* 520 F.2d 1043, 1053 (5th Cir. 1975).

The burden of proof under 42 U.S.C. § 1981 is somewhat different. In *Williams v. DeKalb County,* 577 F.2d 248 (5th Cir.), *modified on rehearing,* 582 F.2d 2 (5th Cir. 1978), the Fifth Circuit held that under the teaching of *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1978) . . ., the named plaintiff and the class must make a showing of purposeful discrimination before casting the burden on the defendant to rebut the charge; that a claim under § 1981 is, for this purpose, to be equated with a claim under the Fourteenth Amendment, dealt with by the Court in *Washington,* rather than under Title VII of the Equal Employment Opportunity Act.

*Washington v. Davis, supra,* established that there was a distinction between claims of racial discrimination under the Constitution and under Title VII. Specifically, an action would not violate the Constitution "*solely* because it has a racially disproportionate impact." 426 U.S. at 239, 96 S.Ct. at 2047 (emphasis in original). Plaintiffs therefore must prove a racially discriminatory purpose to prevail on their claims under 42 U.S.C. § 1981, as well as on any claims of "disparate treatment" under Title VII.

### General Background

American Art Metals Company began over thirty-five years ago as a small aluminum products manufacturing concern operating facilities on Highland Avenue and Bishop Street in Atlanta, Georgia. In approximately 1959, the company moved to a new plant on Fulton Industrial Boulevard in Fulton County, Georgia. Defendant Anaconda acquired American Art Metals sometime during 1962 and retained its tradename, "Amarlite". "Amarlite Anaconda" employs approximately 500 persons at its main plant on Fulton Industrial Boulevard, about thirty employees at the Atlanta Region Sales Office or Georgia District, located on Marietta Boulevard, and about

---

**2.** Although *Teamsters* was brought under section 707 of Title VII, the court therein noted that the burden of proof was the same as that in *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976), a class action brought under section 706 of the Act in which "a broad-based policy of employment discrimination" had been alleged. 431 U.S. at 359, 97 S.Ct. at 1866. The Fifth Circuit implicitly recognized this principle in *United States v. United States Steel Corp.,* 520 F.2d 1043, 1053 (5th Cir. 1975), which was a consolidation of private class actions under section 707. The court made no distinction in the applicable burden of proof.

100 individuals in sales regions outside Georgia. The instant action deals with the allegedly discriminatory practices at the Georgia facilities only. Amarlite Anaconda manufactures architectural aluminum products including doors and storefronts for commercial establishments and windows and curtain walls (aluminum framework for glass walls) for large buildings. The production process begins with the extrusion of aluminum ingots through a large press into the desired shape by use of various dies. The extruded aluminum is subsequently cut, anodized, and fabricated into either standard or custom products. The product is then inspected, packed, and shipped.

The overall operations of Amarlite Anaconda are managed by a "Vice President-General Manager". The organizational structure which existed on November 1, 1976, was typical of the general organizational structure which has existed at all times relevant to this litigation. On that date Amarlite Anaconda was organized into six major organizational units, each headed by one of the following managers who reported directly to the Vice President-General Manager: (1) Director of Manufacturing, (2) Director of Marketing & Sales, (3) Accounting Manager, (4) Employee Relations Manager, (5) Credit Manager, and (6) Systems Program Supervisor. Several subordinate levels of management typically reported to the head of each of these six major organizational units. For example, the following managers reported to the Director of Manufacturing: (1) Production Manager, (2) Purchasing Manager, (3) Production Control Supervisor, (4) Custom Planning Manager, and (5) Engineering Manager.

The vast majority of Amarlite Anaconda's hourly employees have always worked in the operations which were managed by the Production Manager on November 1, 1976. The following managers reported to the Production Manager on that date: (1) Extrusion Superintendent, (2) Finishing Superintendent, (3) Fabrication Manager, and (4) Material Handling Manager. Each of these managers in turn managed one or more departments and one or more area foremen and foremen. Each area foreman had foremen reporting to him. Anaconda assigned each hourly employee to a department and a foreman.

The organizational structure under the Engineering Manager was similar to that under the Production Manager, although it was smaller. All of the hourly employees there were in either the Maintenance Department or the Tooling Department. Maintenance Foremen reported to the Area Maintenance Foreman, who reported to the Maintenance Superintendent, who reported to the Engineering Manager.

In 1956, American Art Metals entered into a collective bargaining agreement with the Local Union, covering all production and maintenance workers. These workers, who are in a single collective bargaining unit, are still represented by the Local Union which also has members in four smaller companies in this area. All of the represented employees are paid on an hourly basis. Substantially all other Anaconda employees working at the two facilities are paid on a salaried basis, and none of these employees is represented by the union.

Until 1977, the applicable collective bargaining agreements provided for separate seniority divisions related to the different production and maintenance functions. For example, under the collective bargaining agreement in force between 1974 and 1977, there were five divisions: Fabrication, Mill (finishing), Material Handling, Inspection, and Maintenance and Tooling. Each of these divisions contained various job classifications. Under the applicable collective bargaining agreements before 1977, all hourly job vacancies were awarded by a hybrid divisional/plantwide seniority system in conjunction with a twenty-four clock hour (three-day) on-the-job tryout, and it is these practices which are primarily under attack in this case. In 1977, straight plantwide seniority was substituted for the hybrid system. Salaried vacancies, which are not covered by the collective bargaining agreements, are awarded on the basis of recommendations and interviews by supervisory personnel.

*Promotions and Transfers within the Bargaining Unit*

The individual plaintiffs and the Commission have sought through statistics and through proof of specific employment practices to prove that black employees were discriminated against in promotions and transfers within the bargaining unit as a whole and the Maintenance and Tooling Division in particular.[3] Specifically, plaintiffs contend that the use of a divisional preference in filling job vacancies, a facially neutral practice, violates Title VII and section 1981 inasmuch as it "perpetuate[s] the exclusion of black employees from the desirable jobs in Anaconda's traditionally white seniority divisions." In addition, they charge that the system of on-the-job try-outs is subjective and inconsistent and is applied in a racially discriminatory manner with the result that black employees have been excluded from the more desirable jobs. These two practices will be discussed below.

### 1. *The Statistical Proof*

To support their claims that these practices have barred black workers from the higher-paying, more desirable jobs, plaintiffs have presented statistical evidence. Initially, they note that in March, 1965, prior to the effective date of Title VII, only white employees occupied the sixty positions in the fifteen highest-paid job classifications held by represented employees,[4] although at that time black workers constituted at least 22% of the bargaining unit. In addition, only white employees occupied at least ten other job classifications.

By September 1, 1970, black employees occupied only three of the seventeen highest-paid job classifications while comprising 41% of the bargaining unit. From January 18, 1969—the beginning of the relevant time period in this action—until September, 1970, there were no vacancies filled by bidding in eight of these top jobs, however.[5] Of the remaining nine job categories, one had only one employee, one had two employees, and one had five employees; these statistics are therefore not probative because of the small numbers involved. Two of the remaining six classifications contained black employees, and the other four were in the Maintenance and Tooling Division. These latter positions are covered in other statistics and will be discussed later.

**3.** Plaintiffs have consistently stated that this is *not* a hiring case, and the statistics set forth in Appendix 1 to this decision demonstrate the reason why. Those statistics are drawn from seniority rosters which were admitted into evidence, and they reveal that from at least March, 1965, Anaconda has employed substantial numbers of black persons. Nor does this case involve initial job assignments, a variant of hiring, per se. Plaintiffs have made no showing of discriminatory assignments of this nature after the effective date of Title VII or within the relevant time period of this action. On the contrary, the statistics set out in the appendix demonstrate that within the relevant time frame the seniority divisions at Anaconda have been racially mixed, except for the Maintenance and Tooling Division in certain years, and thus that the initial assignments were not discriminatory. To the extent that plaintiffs suggest that any absence or small number of black employees in the Maintenance and Tooling Division after 1968 resulted from discriminatory hiring or initial job assignments after July 2, 1965, they cannot prevail. The bid sheets and testimony reveal that all Maintenance and Tooling job openings from 1968 on, with one exception, were filled solely through the bidding process by persons already employed by the company. (As noted earlier, bid sheets prior to 1968 are no longer in existence.) From 1965 until 1968, some black persons were employed in that division, and no evidence was introduced by any party as to whether they were hired or bid in. Plaintiffs' attack on discriminatory hiring or initial assignment policies prior to the relevant time period will, of course, be manifested in their attack on the seniority system.

**4.** These job classifications were Machinist A and B, Maintenance Electrician, Die Corrector A, Maintenance Repairman A, Driver, Press Operator, Inspector Class A, Setup Man, Die Corrector B, Casting Machine Operator, Machine Operator A, Custom Fabricator A, Maintenance Repairman B, Tool Crib Attendant. The top eleven of these classifications, and one other, contained four or fewer employees in each general position; at least eight of the positions were in the Maintenance and Tooling Division.

**5.** These were: Machinist AA, Machinist A, Maintenance Repairman A, Die Corrector A, Press Operator, Truck Driver, Tool Crib Attendant, Hardcoat Crane Operator.

Plaintiffs also note that in September, 1970 the seven "training" positions, all in the Maintenance and Tooling Division, were filled by whites.

In February, 1975, black employees constituted 38% of the bargaining unit. At that time, no black workers but twenty-four white employees held positions in the top seven job classifications. All seven of these jobs were in the Maintenance and Tooling Division. It also appears that in February, 1975 the average wage of the 113 black represented employees at Anaconda was $4.10 per hour, excluding leadman increases, shift differentials and overtime wages, while the average wage of the 186 white bargaining unit employees was $4.25 per hour, excluding the same items. The court is uncertain what use can be made of this information, however, since the average year of hire of the white employees was one year earlier than the average year of hire of the black workers.

At all times since July 2, 1965, with few limited exceptions, Anaconda has compensated its craft workers at higher rates of pay than the rates at which it has compensated its operatives and laborers and at the highest rates of pay available to represented employees at the company. The following EEO–1 figures demonstrate the bargaining unit profile by general job category and race.

| Job Class | June 1, 1969 All Employees No. | June 1, 1969 Black Employees No. | % | Apr. 1, 1975[6] All Employees No. | Apr. 1, 1975[6] Black Employees No. | % | Mar. 31, 1977 All Employees No. | Mar. 31, 1977 Black Employees No. | % | April 1, 1978 All Employees No. | April 1, 1978 Black Employees No. | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Craftsmen [7] | 106 | 24 | 22.6 | 100 | 22 | 22.0 | 90 | 19 | 21.1 | 94 | 25 | 26.6 |
| Operatives | 149 | 89 | 59.7 | 114 | 47 | 41.0 | 64 | 34 | 53.1 | 103 | 43 | 41.7 |
| Laborers | 70 | 40 | 57.1 | 116 | 48 | 41.0 | 104 | 39 | 37.5 | 142 | 66 | 46.5 |
| TOTALS | 325 | 153 | 47.1 | 330 | 117 | 35.4 | 258 | 92 | 35.6 | 339 | 134 | 39.6 |

As will be discussed *infra*, expert testimony established that the weighted average of the black population of the bargaining unit for the years 1966 through 1977 was 36.9%.

Most of Anaconda's craft jobs are located in the Maintenance and Tooling seniority division. Between January 1, 1966 and January 1, 1970, at least thirty-eight openings occurred and were filled in bargaining unit jobs in that division; none of these was filled by a black employee. It was not until 1973 that Anaconda promoted a black employee into one of the craft training programs in the Maintenance Division. As of February 27, 1975, black employees occupied six, or 15% of the forty positions in that division although the percentage of black represented employees in the plant on that date was 37.7%. Finally, the court finds that between July 2, 1965 and April 1, 1977, no black employee was promoted into the following craft job classifications: Tool and Die Maker, Electrician, Master Electrician, Die Corrector A, and Machinist AA.[8]

These statistics, taken together, make clear that the only area in which plaintiffs may be able to demonstrate discrimination in promotions or transfers is in the Maintenance and Tooling Division. In June, 1969, at which time the Maintenance Division had no black employees and at least thirty-four white craft workers,[9] the EEO–1 statistics, see text at 17, *supra*, demonstrate that

6. This chart includes the 100 or so workers employed by Amarlite Anaconda who are not involved in this action.

7. Pursuant to EEO–1 directions, this category includes in addition to the jobs contained in the Maintenance and Tooling Division, certain high-level fabrication job classifications.

8. None of these classifications had more than five employees, and two had only two.

9. No seniority roster for 1969 was introduced. The seniority roster dated August 30, 1968 shows thirty-four employees in the Maintenance and Tooling Division; the roster for September 1, 1970 includes thirty-five employees.

22.6% of the 106 craftsmen were black. Simple mathematics reveals that after subtracting the Maintenance and Tooling jobs from this number, 33.3% of the craft employees were black. A comparison of this figure to the average percentage of black workers in the bargaining unit provides no evidence of a long-lasting and gross disparity and gives rise to no inference of discrimination in "craft" jobs outside of the Maintenance Division. Moreover, the number of black employees in the higher-paying job classifications in 1970 and 1975 indicates that, except as to maintenance and tooling jobs or jobs with a very few employees, no inference of discrimination can be drawn. Further, the racial breakdown by seniority divisions, included in Appendix 1 attached hereto, demonstrates that the seniority divisions, with the exception of the Maintenance and Tooling Division, have, at all times relevant to this action, been racially mixed.

Anaconda does not dispute the validity of any of these figures; in fact, it admits that numerically the statistics could raise an inference of discrimination in the Maintenance and Tooling jobs. It asserts, however, that the statistics are faulty because they include data from at least three years prior to the relevant time period in this action. More importantly, however, Anaconda contends that in presenting these numbers, plaintiffs and the Commission have completely ignored the effects of the bona fide seniority system in allocating job tryouts. It argues that the workings of this system are protected by section 703(h) of Title VII, 42 U.S.C. § 2000e–2(h), as interpreted in *International Brotherhood of Teamsters v. United States, supra.*

### 2. The Teamsters Issue

Section 703(h) of Title VII provides in part:

Notwithstanding any other provisions of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system, . . . provided that such differences are not the result of an intention to discriminate because of race, color, . . . or national origin . . ..

The United States had brought the action in *Teamsters* on behalf of black and Spanish-surnamed employees of the defendant trucking company who had been hired into departments other than the line driver department, which contained the company's highest-paying jobs, and who allegedly were in effect prohibited from transferring to line driver because of the company's seniority system. *Teamsters* involved a strict departmental seniority system under which an employee transferring between departments forfeited all accumulated seniority.

The Court in *Teamsters* noted initially that the Government had proved a prima facie case of systematic and purposeful employment discrimination in hiring and otherwise continuing well beyond the effective date of Title VII. However, it then held that "the routine application of a bona fide seniority system would not be unlawful under Title VII," 431 U.S. at 352, 97 S.Ct. at 1863, and "that an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination." *Id.* at 353–54, 97 S.Ct. at 1864. The Court also held that the perpetuation of post-Act discrimination does not make a bona fide seniority system unlawful. *Id.* at 347–48 and n.30, 97 S.Ct. 1843. This holding unquestionably worked a change in the law. Many circuits including the Fifth, had held that seniority systems which "locked" protected minorities into certain jobs or departments were violative of Title VII as perpetuations of past discrimination. After *Teamsters,* this theory is no longer valid as to the operation of "bona fide" seniority systems.[10]

---

10. The same rule applies under 42 U.S.C. § 1981. In *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157 (5th Cir. 1978), the court stated: "The same protections should apply whether the seniority system is challenged under Title VII or section 1981." *Id.* at 1191–92, note 37.

A. *Evolution and Nature of the Seniority System*

Vacancies for jobs in the bargaining unit at Anaconda are filled under a bidding and job tryout system set forth in section 17(B) of the collective bargaining agreements entered into between Anaconda (or its predecessor) and the Local Union. Each collective bargaining agreement has divided the plant into several seniority divisions. Under the initial 1956–57 contract, seniority was accumulated on a strict divisional basis, and an employee who changed divisions lost the seniority accumulated in his old division after transfer. This loss of seniority upon transfer was removed in the 1957–58 contract. From 1957 until 1961, employees in each division accumulated separate divisional seniority in that division. In 1961, this "divisional" seniority was replaced by modified "company" or plantwide seniority. Section 17(B)(2) of the 1961–63 contract provided that a transferring employee would take "his total seniority with the company" to his new division. This provision was not changed until the current (1977–79) contract, which abolished seniority divisions entirely, establishing pure plantwide seniority for all purposes. Thus, there was a progression from divisional to plantwide seniority through the collective bargaining process.

Bargaining unit vacancies are awarded based on applicable seniority subject to ability to perform the job. Since 1961, section 17(B)(3) of the collective bargaining agreements had provided that:

> In all cases of promotions (except to supervisory positions not covered by this agreement) when new jobs are created, when jobs are re-established, or when other vacancies occur, employees in the division in which such vacancies occur shall be given preference in accordance with their length of continuous service in the company, subject to their ability to perform the work in question after a break-in period of twenty-four (24) clock hours.

\*　　\*　　\*　　\*　　\*　　\*

> In the event that no employee(s) is qualified in the division in which such vacancy exists, or in the event that a new seniority division is established, the Company shall post on its bulletin boards lists showing vacancies available to be filled and employees in other divisions desiring such jobs shall be given the said trial period in order to qualify for such jobs in accordance with their seniority status, before new employees are hired.[11]

Although this section did not require that the opening be posted on all company bulletin boards unless no employee within the division where the vacancy occurred qualified for the vacancy, the testimony of several credible witnesses was that the company voluntarily began posting all such vacancies plantwide in the 1960s. This testimony is supported by various bid sheets entered in evidence which contain names of employees inside and outside of the division with the vacancy. Section 17(B)(2) of the 1977–79 contract provides for posting of all bargaining unit vacancies for plantwide bidding.

The procedure from 1961 to 1977 may thus be summarized: each bargaining-unit vacancy is posted on company bulletin boards. All employees may bid, based on their total company seniority. However, until 1977, the employees within the division having the vacancy had priority over other employees in obtaining a three-day tryout, based on their plantwide seniority. If no one within the division bid or qualified, bidders from other divisions were awarded tryouts based on total plantwide seniority. Once in the division, an employee could utilize full plantwide seniority on all future openings within that division. There was no forfeiture of seniority upon transfer. As a practical matter, most promotions would be made within a division, if someone bid and passed the tryout. A va-

---

11. Prior to 1961, the language "after a break-in period of twenty-four (24) clock hours" was not included in this portion of the contracts.

cancy often had a ripple effect by which an entry-level position at the bottom of the division would be vacated by a promoted employee. This entry-level position would be filled from outside the division, based on plantwide seniority. Thus, an employee seeking to change divisions would likely have to start at the bottom of the new division. However, the transferee retained his plantwide seniority, which he could use on all future openings to outbid employees in his new division who had less plantwide seniority.

Plaintiffs assert that this "divisional preference" is not protected by *Teamsters* because it is separate and distinct from Anaconda's seniority system and because, even if it is a seniority provision, the seniority system in question is not bona fide. With regard to the first point, plaintiffs apparently claim that the preference is not based on "seniority". This contention is best illustrated by a hypothetical situation advanced by the Commission involving two employees. Employee A was hired into Division I forty-five days ago. Employee B was hired into Division II twenty years ago. Because of the divisional "preference," Employee A will obtain a tryout on a Division I opening prior to Employee B if both bid. This, it is contended, ignores the greater seniority of Employee B and cannot be a part of a "seniority" system.

Precisely the same effect was present in the *Teamsters* seniority system, however. Under that system, as made clear by the lower and Supreme Court opinions, an employee with one day in a division would be given priority over an employee from outside of that division with twenty years seniority with the company. The major operative difference between the systems in *Teamsters* and this action is that under the Anaconda system an employee transferring to another division would be able to transfer his full company seniority for purposes of subsequent job bids, while the transferring employee under the seniority system involved in *Teamsters* would start from day one after his transfer. Moreover, the divisional aspects of the *Teamsters* seniority system which could operate to protect less senior plantwide employees over more senior plantwide employees, as is the case with Anaconda's system, were the specific aspects of the seniority system which the Court deemed protected by section 703(h). The Court agreed that the *Teamsters* system operated to "lock" minority workers into city driver jobs. 431 U.S. at 344, 97 S.Ct. 1843. Nevertheless, the Court held that these "advantages of the seniority system" which "flow disproportionately" to white employees, *id.* at 350, 97 S.Ct. 1843, were immunized by section 703(h). In short, the Commission's argument concerning the "preference" for divisional incumbents was effectively rejected in *Teamsters.* The Court stated its reasons, in part, as follows:

> In addition, there is no reason to suppose that Congress intended in 1964 to extend less protection to legitimate departmental seniority systems than to plant-wide seniority systems. Then, as now, seniority was measured in a number of ways, including length of time with the employer, in a particular plant, in a department, in a job, or in a line of progression. . . . The legislative history contains no suggestion that any one system was preferred.

431 U.S. at 355, note 41, 97 S.Ct. at 1864–65, note 41.

The plaintiffs and Commission also contend that two Fifth Circuit decisions support their position. While *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211, 240 (5th Cir. 1974), contains relevant language favorable to the Commission, this decision was handed down before *Teamsters* changed the law, and must be read in that context. *James v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 338 (5th Cir. 1977), quoted the above language from *Pettway* in a context completely removed from seniority. *James* held that a dual scoring system which preferred job bidders within departments was unlawful. This had nothing to do with the seniority system, which was treated separately. *James* therefore makes no attempt to lay down the rule which

plaintiffs and the Commission urge, *to-wit:* that any sort of preference is, as a matter of law, not part of a seniority system. Accordingly, the court finds that the divisional preference in the instant action is a protected part of Anaconda's seniority system. *See also Alexander v. Aero Lodge No. 735, I.A.M.,* 565 F.2d 1364, 1378 (6th Cir. 1977).

### B. *Factors in determining the Bona Fides of a Seniority System*

■ The court must next consider whether the seniority system in question was bona fide and thus entitled to the protection afforded by section 703(h). Under the system involved in *Teamsters,* competitive seniority was accumulated only within separate bargaining units existing for line (over-the-road) drivers and city drivers. A city driver wishing to become a line driver had to forfeit all his seniority. As noted, the Court recognized that this system operated to "freeze" black and Spanish-surnamed employees into city driving jobs, but held that it was nonetheless a "bona fide" system protected by section 703(h), reasoning as follows:

> It [the seniority system] applies equally to all races and ethnic groups. To the extent that it "locks" employees into non-line-driver jobs, it does so for all. The city drivers and servicemen who are discouraged from transferring to line-driver jobs are not all Negroes or Spanish-surnamed Americans; to the contrary, the overwhelming majority are white. The placing of line drivers in a separate bargaining unit from other employees is rational in accord with the industry practice, and consistent with [National Labor Relations Board] precedents. It is conceded that the seniority system did not have its genesis in racial discrimination, and that it was negotiated and has been maintained free from any illegal purpose. In these circumstances, the single fact that the system extends no retroactive seniority to pre-Act discriminatees does not make it unlawful.

431 U.S. at 355–56, 97 S.Ct. at 1865. The Fifth Circuit interpreted this language in *James v. Stockham Valves & Fittings Co., supra,* at 351, to mean that "the issue of whether there has been purposeful discrimination in connection with the establishment or continuation of a seniority system is integral to a determination that the system is or is not bona fide." It further noted that "the totality of the circumstances in the development and maintenance of the system is relevant to examining the issue." *Id.* The Court then extracted the following four factors from *Teamsters* to be used to determine whether a system is bona fide:

(1) whether the seniority system operates to discourage all employees equally from transferring between seniority units;

(2) whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice);

(3) whether the seniority system had its genesis in racial discrimination; and

(4) whether the system was negotiated and has been maintained free from any illegal purpose.

*Id.* at 352. These guidelines will now be applied to the present facts.

■ (1) *Equal Discouragement.* Anaconda's seniority system is facially neutral, applying to all bargaining unit employees. While the plaintiffs attacked the administration of job tryouts, their major complaint regarding the seniority system, apart from their contention that it perpetuated past discrimination, was that it discouraged black employees from bidding on jobs outside the seniority division in which they worked, particularly jobs in the Maintenance and Tooling Division. Because there have always been more whites than blacks outside this division, any discouragement clearly lacked racial effect or motivation.[12]

---

12. This is readily apparent from Appendix 1 to this Order, which summarizes seniority rosters in evidence. For example, as of March 1, 1965, 192 whites and 79 blacks were employed outside the Maintenance Division. That is, over twice as many whites as blacks were affected on bids into Maintenance in 1965.

(2) *Rationality of Seniority Units Vis-a-Vis Bargaining Units.* Unlike *Teamsters,* the separate seniority divisions in this case are contained in a single bargaining unit. The court finds that the seniority divisions served the business purpose established by the company: to encourage and maintain a skilled pool of employees performing the major production, as well as maintenance and tooling, functions. This was in accordance with industry practice nationally, as shown by the evidence.

(3), (4) *"Genesis" of System; Negotiation and Maintenance of System.* Although *James* initially listed these as two separate factors, the court later analyzed them together, *see* 559 F.2d at 352–53, and this approach will be adopted here. Section 703(h) protects the operations of seniority systems unless they are "the result of an intention to discriminate . . . ." Thus, the ultimate issue is intentional discrimination in the creation or maintenance of a seniority system.

The seniority system in the present case was originally negotiated in 1956, contemporaneous with the establishment of the Local Union as bargaining representative. The testimony of union and company negotiators who took part in these and subsequent negotiations established that two of the four union members on the initial union bargaining committee were black. These two employees,"Shorty" Slaton and Howard Clifton, had participated in the successful effort to organize the Local Union at American Art Metals as a racially integrated local. Evidence also established that the union negotiating committee of four or five contained at least one, and generally more, black members in all negotiations.

The testimony was that at the original negotiations the union proposed plantwide seniority while the company proposed departmental seniority. The company was concerned about the diversity of the work done in the various production and maintenance functions. It also feared that plantwide seniority would produce chaotic results as bidders with no prior experience in a particular job would have the right to try out on that job, increasing greatly the time and expense involved filling vacancies. This position was consistent with industry practice. Anaconda established that many of its higher-rated hourly jobs require special skills, and the company therefore sought to develop a group of skilled employees in each division and to avoid a long and costly series of qualifying tryouts on every job vacancy. The union proposed plantwide seniority as the system allowing the maximum potential mobility for every employee. In the second contract negotiated one year later, the forfeiture of divisional seniority on transfer was eliminated. In 1961, plantwide seniority was established as the determinant in bidding, except that divisional incumbents could exercise their plant seniority before nonincumbents. Several other changes were made with regard to layoffs and "bumping". Finally, in 1977, plantwide seniority for all purposes was negotiated when it appeared that there would be no contract without it.

There was a six-week strike in 1965 which involved the seniority issue. Two class members testified that the whites in the union always voted down plant seniority, while the blacks always supported it. This testimony was overcome by numerous other witnesses who testified that union members did *not* divide on racial lines over this issue. The votes to strike and to end the strike (without full-fledged plant seniority) make this conclusion virtually inescapable. Based on the approximately even racial breakdown of the union, the large number of members voting, and the overwhelming final tallies, it is clear that the vast majority of union members of both races voted to strike for plantwide seniority and to end the strike without it. In 1974 through 1977, petitions were circulated by the union to discover members' feelings on plantwide seniority. The only petition returned was that circulated in the Maintenance and Tooling Division. Five of the six black employees in the division at that time voted *against* plantwide seniority. This

strongly suggests that the real split in the bargaining unit was craft versus noncraft, rather than white versus black.

Several witnesses who participated in contract negotiations denied any racial motivation concerning the seniority system. There was no direct evidence to the contrary. The court is aware of the general practice of racial segregation in Atlanta, Georgia in 1956. However, this fact does not lead to the inference that the *seniority system itself* was "the result of an intention to discriminate" in the language of section 703(h). As the district court noted in *Swint v. Pullman-Standard,* 17 F.E.P. 730, 737 (N.D.Ala.1978), "[B]ased on the very extent of such other forms of discrimination, it may well be that racial considerations were not involved—being 'unnecessary'—in the development of a particular practice."

The conclusion that the seniority system was created and maintained without a racially discriminatory motive is buttressed by certain exhibits indicating the widespread utilization of departmental seniority systems in manufacturing plants all over the United States about the time that this system was adopted at Anaconda. One of these was a United States Department of Labor publication dated 1949 which stated that employers generally favored departmental seniority and unions generally favored plantwide, for economic reasons having nothing to do with race. Two other exhibits contain examples of actual collective bargaining agreements executed before and after 1965 which contained divisional or departmental seniority provisions. These involve companies and unions all over the United States, indicating the typicality of this practice in various industries.

Plaintiffs have argued that the system has not been maintained free from any illegal purpose because Anaconda has circumvented the system in order to perpetuate discrimination. In short, they contend that the company has transferred job classifications among the divisions to keep black employees from obtaining the high-paying, more desirable jobs. The history of the specific changes complained of negates any racially discriminatory purpose, however.

The new union contract, effective August 30, 1968, made some major overhauls in the seniority divisions and job classifications for purposes of efficiency and economy. One of these changes was to transfer the job of Maintenance Porter, which had existed in the Maintenance Division only from 1965 to 1968, to a separate Labor Division. The testimony established that this was essentially a custodial or janitorial job consisting of sweeping and cleaning up all over the plant. It was not a training position for jobs in the Maintenance Division—although, of course, employees in that job could use the divisional preference in bidding for higher maintenance jobs—and therefore its inclusion in this division was less logical than its placement into a separate division, based on the type of work performed. Further, under the divisional seniority system, employees with seniority in other divisions generally had to bid down into the low-level maintenance jobs to enter the Maintenance Division. The company sought to remedy this situation by instituting a maintenance training program and removing the unattractive Maintenance Porter job. This testimony was confirmed by union witness W. W. Hudson, who testified that the porter job was unattractive and was replaced by maintenance trainee positions. Thus, the company's legitimate business purpose in eliminating the Maintenance Porter position is clear.

Plaintiffs also complain of the transfer of the Die Corrector A classification from an integrated division to the Maintenance and Tooling seniority division, which upon the transfer of the Maintenance Porters no longer had any black employees. The testimony established the company's business purpose in making this change: to collect all "craft" positions into one seniority division. A new man was apparently in charge of the extrusion press in 1968 and felt it necessary to improve the supervision and product of the Die Correctors. By placing them in the Tooling department, they were given a separate work area with good tools and proper supervision. The result was a

better product and more training for the Die Correctors; the purpose of this move was economic.

As to the alleged racial effect of these changes, plaintiffs suggest that the transfer of the four Die Corrector A positions to the Maintenance Division harmed the black workers in the Die Correctors' old division by removing their preference in bidding. However, another result of the changes begun in 1968 was the initiation of craft training programs, including that of Die Corrector B as the entry-level position prior to Die Corrector A. Die Corrector B, although in the Maintenance Division, was open to bidding plantwide, as were all trainee craft positions in that division. Thus, there was no adverse effect, since no one within the division would want to bid down to an entry-level trainee position. Moreover, the evidence reveals that as of June 1, 1968, there were twenty-one whites and six blacks in positions other than Die Corrector A in the old division. The adverse impact, if any, was therefore greater upon whites than blacks. Thus, there was neither a discriminatory purpose nor effect in the transfer of the Die Correctors. Plaintiffs have also argued that the transfer of the porter jobs was improper and discriminatory, at least in part, because white maintenance porters were permitted to remain in Maintenance but black porters were not. The evidence reveals that sometime prior to the contract changes made in 1968 certain of the white porters bid into Maintenance Repairman positions. The bid lists and testimony demonstrate that none of the black porters bid on higher maintenance jobs, although several porters of both races bid out of the Maintenance Division. Further, when the porters' job classification was changed and placed in a separate division, both white and black former maintenance porters became laborers in the new division. It therefore appears that Anaconda transferred the Maintenance Porter job classification, which included employees of both races, in good faith to a more appropriate location, as was its prerogative.

Plaintiffs also questioned the creation of the new classification of Maintenance Helper in 1968, apparently because the four positions were filled by whites only. This position was created under the 1968 contract as an entry-level maintenance position to be posted plantwide. The exhibits demonstrated that the four employees who took these jobs took pay cuts in order to become Maintenance Helpers. Moreover, the bid lists for these jobs show that the senior bidder was F. Webb, a black employee; he turned down the job. Mr. Webb did not testify at the trial, and the court declines to infer, as plaintiffs would have it do, that there was anything coerced in his rejection of the job. The lists further demonstrate that these jobs went to the senior bidders—based on strict plantwide seniority—except one, and that the individual who was rejected on that occasion was white.

Plaintiffs further contend that the elimination of positions in the Maintenance and Tooling Division in 1977 supports their argument that the seniority system was not bona fide. The evidence is to the contrary. To implement the recommendations of an outside efficiency consulting firm, the John Charles Company, six maintenance positions, including two Maintenance Repairmen A and four Maintenance Repairmen B, were eliminated in 1977. Three black and three white employees were cut based on seniority within these two job classifications. Since then, as the most recent seniority roster reflects, seven employees have been added back to Maintenance, including three blacks.

The court concludes that none of the incidents cited by plaintiffs can support a finding that the seniority system was maintained with an illegal purpose. It therefore holds, based on the individual factors, as well as the "totality of the circumstances", that the divisional priority was an integral part of Anaconda's seniority system and that the seniority system is bona fide and therefore protected under section 703(h) of Title VII. This decision, of course, answers plaintiffs' claim that the divisional preference is an improper and discriminatory employment practice as well.

### 3. Anaconda's Statistics

Having reached this result, the court must now determine whether the disparity between the number of black and white employees in the Maintenance and Tooling Division, demonstrated by plaintiffs' statistics, is attributable to the workings of the bona fide seniority system or to other causes. Anaconda proffered expert testimony through Dr. Donald Jewell concerning the filling of vacancies within the Maintenance and Tooling Division from October, 1968 to July, 1977. Dr. Jewell conducted an "opportunities" analysis of all available bid records during that time period for all jobs within that division. He found that from 1968 to 1977, there were 124 openings in maintenance and tooling jobs and that 99 or 80% of these vacancies were awarded through the bidding process. Twenty-five or 20% of the positions were bid on but not awarded. Of bids awarded, eleven or 11% went to black employees. Sixty-six or 67% of all openings awarded (99) were filled by the most senior bidder [13] who accepted the bid. In those twenty-seven situations where the most senior bidder was not offered the position,[14] there were (a) four instances (11%) where a white was awarded the job over a more senior black, (b) five instances (14%) where a black was awarded the job over a more senior white, (c) twenty-one instances (60%) where a white was awarded the job over a more senior white, and (d) five instances where a black was awarded the job over a more senior black. In the twenty-five instances where openings were not awarded to any bidder, a black worker was the most senior in five instances, a black was the only bidder and was awarded a job but turned it down in one instance, and a white employee was the senior bidder in nineteen cases. On the basis of these statistics Dr. Jewell concluded that seniority was the primary factor upon which bids were awarded and that when it could not be ascertained from the records that strict seniority was controlling, no pattern of discrimination was shown. He also concluded that no pattern of discrimination was shown in those cases where the job was withdrawn and not awarded.

The study further revealed that the proportion of black workers bidding on jobs in the Maintenance and Tooling Division (30%) was comparable to the weighted average of black employees in the bargaining unit (36.9%). Similarly, the percentage of refusals by black employees offered the job (33%) was in keeping with the bidding percentage. These figures suggest that black employees participated fully in the bidding for jobs in this division and were not coerced into refusing the positions when offered.

Dr. Jewell also made a special study of the position known as Maintenance Repairman B, which was the entry-level job for the Maintenance Division during most of the relevant time period and one of the positions on which claims of discrimination focused. Of nineteen openings, eight or 42% were filled by black employees, and 33% of all bidders for these positions were black. In those instances where the position was not awarded to the senior bidder, there were (a) four instances (31%) where a black was awarded the job over a more senior white; (b) one instance (8%) where a white was awarded the job over a more senior black; (c) three instances (23%) where a white was awarded the job over a more senior white; and (d) five instances (38%) where a black was awarded the job over a more senior black. Dr. Jewell noted that black workers fared better than would be expected when compared to their average percentage in the bargaining unit (36.9%) or to their percentage of bids (33%) and concluded that Anaconda seemed to be making a special effort to place black employees in this entry-level position.

---

13. The most senior bidder for these purposes is either the individual who exercises his divisional preference and has more plantwide seniority than others using the preference or the employee who has no divisional preference to use and obtains the job solely on the basis of his plantwide seniority.

14. This does not include six instances where openings were filled but bid sheets were not available.

■ Anaconda has demonstrated that the majority of maintenance and tooling jobs were awarded to the most senior bidder under the seniority system and that with regard to those positions not awarded to the most senior or to any bidder no inference of racial discrimination is possible. Because the seniority system is bona fide, its normal operations are immune from attack under Title VII and section 1981. Therefore, to the extent that individual job awards and overall statistics reflect the working of the seniority system, they do not prove violations of Title VII. The court concludes that plaintiffs' statistics, indicating the small percentage of black employees in the Maintenance and Tooling Division, have been explained and rebutted by Anaconda and, accordingly, give rise to no inference of discrimination in promotions or transfers within the bargaining unit.[15] *See Alexander v. Aero Lodge, supra,* at 1383.

### 4. *The Tryout System*

In addition to the divisional preference, plaintiffs attack the system of on-the-job tryouts utilized by the company. They contend that such tryouts are subjective and are administered in a racially discriminatory manner with the result that black employees have been excluded from the more desirable, higher-paying jobs.

As noted above, the right to obtain a job tryout is governed by the seniority system. Anaconda has delegated to its foremen the responsibility for administering and determining satisfactory performance on such tryouts. The Maintenance Superintendent, or the appropriate head of the other overall departments, then makes the final decision on the tryout, based primarily on the recommendation of the foreman who administered it.

There are basically two types of job tryouts employed by Anaconda. In the simpler production jobs, such as packing doors, the tryout simply consists of performing the job itself. Successful completion of the tryout is generally defined in terms of production standards, which under different names the company and its predecessor have used for years. Under the present system, the jobs are rated in terms of realistic time values (RTVs). For example, a job involving the packing of doors might have a standard of ninety doors packed per hour. At the beginning of a tryout, the production standard or RTV is explained to the candidate, and candidates having trouble meting the standard are counseled by the foreman during the tryout. By the terms of the contract, the employee must demonstrate the ability to perform the job within the tryout period. While the production standards and RTVs are apparently in writing, no written guidance as to how rigidly they are to be applied has been established. In practice, however, it appears that the employee is not expected to reach the final production standard during the tryout period. Rather, the candidate is expected to show improvement over the three days and to achieve between 85 and 90% of the standard by the end of the last day. Finally, it is somewhat unclear for which of the production jobs these standards were actually used.[16]

---

15. Having concluded that Anaconda has rebutted plaintiffs' statistical proof, the company's assertions that the statistics were improper under *Hazelwood School District v. United States,* 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), because they failed to take into account the special skills required for jobs in the Maintenance Division need not be considered. While the court agrees that special skills are necessary for the upper-level maintenance and tooling jobs, in view of the presence of training programs for such jobs, a comparison to the percentage of black workers in the Atlanta area SMSA who already possess these upper-level skills would not appear to be meaningful.

16. Plaintiffs' evidence focused upon the absence of standards for maintenance and tooling jobs, and defendants responded to that issue and also presented evidence as to standards in relatively simple production jobs. There thus appears to be a gap in the proof, and the court is frankly uncertain into which category tryouts for the more complicated production jobs fall. This problem is probably surmountable, however, since plaintiffs do not appear to complain of discrimination in the fabrication jobs. In fact, the named plaintiffs hold jobs in the highest job classification in this area.

In the area of maintenance and tooling jobs, the tryout is somewhat different. Because the maintenance employees are required to prepare and maintain every piece of machinery in the plant, because of the number and complexity of these machines, and because maintenance employees must be able to work independently and use their own judgment as to diagnosing and repairing "down" machinery, maintenance tryout candidates are required to perform a series of tasks which cover various skills they will need in performing their duties. For example, on a Maintenance Repairman B tryout, an employee is given tasks which include welding, work at heights, and repair of less complex machinery. The candidate might be required to build an anodizing rack or buffing hood (which task tests ability to read blueprints, to cut and drill, and to weld), to paint from a ladder the tops of tanks, and to tune up a forklift or other simple piece of machinery. A tryout of this nature, adjusted to the increased skills needed, is given for the higher maintenance positions. To the extent possible, candidates trying out for a particular opening are given the same or equivalent tasks. This is more true for the lower-level jobs since the tryouts on higher job classifications often involve repairs on whatever equipment happens to be "down" at the time. The bulk of these maintenance tryouts were administered by either Ray Gardner or John Snelling, both of whom are white foremen,[17] and, as a general rule, tryouts for a specific vacancy are conducted by the same foreman.

In all tryouts, the employee is informed at the end of the third day by the foreman and the foreman's supervisor as to whether he passed or failed. In certain instances in which an employee demonstrates substantial potential but does not completely pass the tryout, a thirty-day extension of the tryout period can be granted. A dissatisfied employee can also initiate contractual grievance proceedings after the tryout. The thirty-day extension policy, originally begun unilaterally by the company, was utilized several times in maintenance tryouts for black employees who showed sufficient ability in some areas but not others, such as, for example, welding.

Apart from the production standards or RTVs previously discussed, Anaconda has not furnished its foremen or supervisors with any written guidelines, standards, procedures or instructions to explain how tryouts should be conducted, which tasks should be assigned, or what level of assistance employees should receive, although the testimony indicated that, even absent standards, tryouts at least for the entry-level maintenance jobs are relatively uniform in terms of the tasks assigned and have been for some time. Nor has Anaconda established any standardized objective criteria for evaluating the quality or quantity of an employee's performance during a tryout. For example, welding is judged by visual inspection and by tapping the welded item on the floor to see if it will hold or bend.

Prior to 1977, the company did not require that a written evaluation of an individual's performance on a tryout be kept although certain foremen did make such records. Beginning in that year, however, it instituted use of a standard Qualification/Disqualification form which is used for all jobs in the bargaining unit. The form is not geared to each specific job, however, and does not contain any explanation of how it should be completed or used.

Plaintiffs apparently have sought to prove discrimination under the tryout system by means of both disparate impact and disparate treatment. To prevail under the latter theory, they must show a pattern or practice of purposeful discriminatory treatment of black employees. Plaintiffs contend that Anaconda systematically denied many black employees a tryout period as long as or easy as that provided for whites, that the company provided assistance to whites but not to blacks, and

17. Gardner has now been promoted to area foreman, and therefore apparently no longer conducts tryouts himself.

that the company engaged in or condoned harassment of black tryout candidates. The latter two contentions may be disposed of easily. While certain instances of these types of discrimination may have occurred, especially prior to 1965, the evidence was clearly insufficient to support an inference of systematic, classwide discrimination under these headings. As to the first contention, there was considerable conflicting testimony from black employees and from supervisory personnel concerning the content of specific tryouts on various jobs. Most of these tryouts occurred prior to January 18, 1969 and a substantial portion of these prior to July 2, 1965. Many others were not dated. None of these events can be used to fix liability. As to the remaining tryouts, which occurred within the relevant time frame, several involved instances where either another black employee got the job, another black employee had previously held the job, or the unsuccessful black candidate got the same or a better job within a very short time thereafter, frequently as a result of additional training. The handful of remaining instances of alleged discrimination, even if given credence, are simply too few and far between over the lengthy time period and large number of persons involved to constitute a pattern or practice of disparate treatment by any stretch of the imagination.

■ Plaintiffs' attack on the subjective nature of the tryout—the lack of written, standardized procedures and the subjective judgment of supervisors in promotional decision-making—seems, on the other hand, to fall under the disparate impact theory. In this regard, the reasoning of the Supreme Court in *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280 (1975), becomes relevant:

In *Griggs v. Duke Power Company*, 401 U.S. 424 [, 91 S.Ct. 849, 28 L.Ed.2d 158] (1971), this Court unanimously held that Title VII forbids the use of employment tests that are discriminatory in effect unless the employer meets "the burden of showing that any given requirement [has] . . . a manifest relationship to the employment in question." *Id.* at 432 [, 91 S.Ct. 849]. This burden arises, of course, only after the complaining party or class has made out a prima facie case of discrimination, i. e., has shown that the tests in question select applicants for hire or promotion in a racial pattern significantly different from that of the pool of applicants.

(Citations omitted.) Plaintiffs in the instant action failed to introduce statistics relating to pass/fail rates under the tryout system, and there was no direct and relevant evidence tending to show that the system is discriminatory in effect. Plaintiffs appear to rely instead on the statistical evidence previously discussed in detail. As noted earlier, however, *see* text at 24, the only possible area in which the statistics give rise to an inference of discrimination is in the Maintenance and Tooling Division, and Dr. Jewell's findings make clear that any adverse impact suffered by black employees in attempting to enter that division during the relevant time period resulted from the bona fide functioning of the seniority system and not from a discriminatory tryout system. In fact, Dr. Jewell found that 42% of the Maintenance Repairmen B positions were filled by black bidders. Thus, black employees fared better than would be expected when compared to their overall percentage in the bargaining unit. As stated earlier, Dr. Jewell also found that in the instances where a job may not have been given to the most senior bidder, blacks received a greater percentage of the openings than when the most senior bidder received the job. This suggests that even where seniority could not be conclusively established, black employees did not suffer from discrimination. In addition to rebutting any inference of disparate impact, these statistics also tend to rebut any pattern of disparate treatment in the operation of the tryout system.[18]

---

18. While the court believes that the tryout system is job-related and has not systematically been administered in a racially discriminatory manner, it feels compelled to note that because of the lack of objective standards, primarily in the Maintenance tryouts, this system could

### 5. Other Practices Regarding Bargaining Unit Employees

The Commission and the plaintiffs have raised several other alleged unlawful employment practices in relation to bargaining unit employees. These will be dealt with seriatim in this section.

#### A. Job "Residency" Requirements

■ The Commission attacks "residency" requirements for five job classifications contained in the Maintenance and Tooling Division which were imposed under the collective bargaining agreement in force from 1974 through 1977. These requirements were as follows:

| | |
|---|---|
| Machinist Class AA | Four Years as a Machinist Class A with die experience |
| Tool & Die Maker | Four years apprenticeship as tool & die maker, or five years as AA or master machinist |
| Master Electrician | Five years as an electrician |
| Master Die Corrector | Five years as die corrector |
| Millwright | Four years as a class A maintenance repairman |

The Commission contends that these requirements were imposed in jobs filled exclusively by whites and had the effect of excluding blacks from the jobs, and it is true that during the time period in question only whites (fourteen in all) filled these jobs.

Initially it must be noted that the term "residency" is a misnomer. Nowhere does it appear in the collective bargaining agreement. Rather, the period of time in question is an "apprenticeship" system under which employees were required to gain the experience in one job for a certain period of time before moving into a higher position requiring the mastery of substantial skills. It is significant that with the exception of Machinist Class AA, the other job classifications for which there were apprenticeship requirements were newly created under the 1974–77 collective bargaining agreement. In effect, they were added as upgrades for existing classifications when an employee

had obtained sufficient mastery of skills. Moreover, testimony from both company and union witnesses indicated that apprenticeship requirements of this sort existed nationally in these crafts. In view of the fact that there were more white than black employees in the Maintenance and Tooling Division, the evidence submitted does not support the contention that this facially neutral practice impacted adversely on black employees or was adopted for a discriminatory purpose.

#### B. Temporary Job Assignments

■ Both the Commission and the private plaintiffs complain that Anaconda systematically assigned senior black employees to the less desirable and less valuable temporary job assignments, while assigning white employees with less company seniority to the more desirable or more valuable job opportunities, which provided more training for promotions. This is purely a claim of disparate treatment. Several black employees testified that they received such inferior assignments, while several supervisors testified that they did not award temporary job assignments on any basis other than which employee was available. Apparently a great deal of the dissatisfaction with temporary assignments to lower-rated jobs arose during the time period 1967 to 1969 when several black employees, including the named plaintiffs, were transferred from the Interior Door Department to the Custom Department.[19] Because these new employees had no experience with the more complicated machinery and procedures in Custom, their foreman found it necessary when work was slack to fill temporary job assignments outside the Custom Department with these new and less experienced employees, rather than the older and more experienced employees already in that division, and their assignment to lower-rated temporary jobs caused dissatisfaction for the plaintiffs and other witnesses, who

---

very easily be the vehicle for discrimination. Anaconda would do well to attend to this problem.

**19.** To the extent that these alleged instances of discrimination occurred before January 18, 1969 they would provide no basis for liability under the Act.

thought—erroneously—that the contract provided for all temporary assignments by seniority. The contract did not then or ever provide that lower-rated jobs had to be assigned to the junior employees. Section 10(c) of the collective bargaining agreement provided that the company had the right to assign employees to other work classifications so long as temporary assignments to a higher-rated job "shall be assigned to senior employees when practicable or assigned for no duration of more than two weeks. Further, junior employees will not be consistently assigned to a higher rated job for the purpose of qualifying such employees for such higher rated job(s)." No specific evidence was presented to show that this provision was violated. What was perceived as racial discrimination therefore appears to be merely the supervisors' attempt to keep the division running with the most qualified and experienced employees. The evidence shows that once the new black employees in Custom took training courses made available by Anaconda in 1968 and 1969, they advanced rapidly. The named plaintiffs currently hold the top positions in Custom, which are among the highest-paid jobs in the plant, and several other witnesses who testified for the plaintiffs also hold high-paying positions in Custom. In view of the foregoing, the court finds no pattern or practice of discrimination with regard to such assignments.

### C. *Elimination of Job Classifications*

■ Plaintiffs charge that Anaconda has engaged in a pattern of eliminating, merging and transferring job classifications or employees, with the purpose or fact of increasing racial segregation. They question several such job changes, many of which occurred in 1968. Any such changes occurring prior to January 18, 1969, would, of course, not be the basis of liability. The only post-1969 changes under this heading concern the elimination and later replacement of several jobs in the Maintenance Division.

Plaintiffs apparently contend that the company's failure to continue the Mainte-nance Helper position, created in 1968, was racially motivated. The evidence reveals that such is not the case. The Maintenance Helper position simply did not work out. Insufficient bids were received for it, perhaps because senior workers had to take a pay cut to take this job. In order to attract more senior workers into maintenance training positions, the company unilaterally decided, sometime in 1969 or 1970, to ignore this classification and therefore not fill any more of these positions and to put into effect a pay retention program for Maintenance Repairman B. This latter position therefore became the lowest level job in Maintenance once the individuals employed as Maintenance Helpers transferred out of that classification. The court cannot conclude that this decision was intended to further racial segregation. Nor will the removal of six jobs in the Maintenance Division in 1977, pursuant to the recommendations of an efficiency expert, which change was discussed earlier in this order, give rise to such an inference. The pre-1969 changes complained of have also been discussed previously, in connection with the bona fide seniority system; the evidence indicated legitimate business purposes for these decisions, and no racial impact was shown. The court therefore concludes that there was neither discriminatory purpose nor effect in this area.

### D. *Exclusion from Training Programs*

■ Plaintiffs contend that Anaconda has systematically denied black employees the opportunity to participate in formal training programs and training jobs by exclusion or elimination of the opportunities. The evidence fails to support their position. They contend, for example, that after the abolition of the Interior Door Department in 1967 and transfer of its employees to the Custom Division, black employees were prevented from using their seniority to "bump" into the Maintenance Division. This complaint was arbitrated with no success. In addition, in response to charges filed with it, the Commission determined, after investigation, that the charging parties fared no worse than some of their similarly placed

white counterparts, and better than others. Plaintiffs have offered no evidence which suggests that this conclusion was incorrect.

Plaintiffs also argue that black employees have been excluded from the maintenance training programs. This is clearly untrue with regard to the Maintenance Repairman B jobs, inasmuch as Dr. Jewell's study revealed that black bidders obtained 42% of those jobs; no evidence within the relevant time period was offered as to the other training positions. That a black worker did not enter the maintenance repairman program until January, 1973, although this classification was designated a "trainee" position some time in 1969, is not probative. First, the vacancy filled by a black employee in 1973 was only the second to be posted on which no former Maintenance Helpers would be able to exercise a divisional preference, and thus, only the second opening after the position actually became an entry-level job. In addition, two senior black bidders, Daniel and Fulton, had been given tryouts the only other time the position had been posted as an entry-level job, during the summer of 1971. Both of these employees failed the tryouts. Daniel did not testify at the trial and thus no inference can be drawn as to his qualifications. Fulton did testify, and certain racks which he welded during the tryout were introduced into evidence. The court concludes, on the basis of these objects, that Fulton was not qualified for the job, and thus, it can draw no inference regarding the exclusion of blacks from these training positions. It appears from the bid list for the 1971 vacancies that two white workers who were senior to Fulton, and others who were junior to him, were also turned down. On the basis of the foregoing, the court finds that the training jobs in the Maintenance and Tooling Division were fully available to black employees.

E. *Tests and Educational Requirements*

 One facet of the plaintiffs' attack on Anaconda's selection methods is its allegation that "racially discriminatory tests and educational requirements, which have not been validated as accurate predictors of successful performance but which have excluded a disproportionately high percentage of black employees from Anaconda's higher-paying and more desirable jobs and training programs" have been employed. As to educational requirements, the Commission failed to establish that any such formal educational requirements ever existed. In the collective bargaining agreements applicable to hourly jobs, educational requirements are not a criterion, and the testimony was uncontroverted that no such requirements have ever been imposed as to any hourly job.

As to testing, plaintiffs proffered an interrogatory and response from the company which stated that various tests were given prior to 1969 for various job classifications. The uncontroverted testimony was that the Wonderlic test, discontinued in 1968, was purely an initial hiring test; it therefore has no bearing on this action. Any other tests which may have been given occurred in isolated instances prior to January 18, 1969, with one exception. It appears that the Bennett Mechanical Comprehension Test was given as late as 1970. The testimony revealed, however, that this test was not used as a prerequisite to a tryout but was used to measure a candidate's strengths and weaknesses in various areas so that his training would be expedited if he passed the tryout. There was no evidence that this test was used to bar anyone from a job or a tryout in the Maintenance Division, particularly within the relevant time period. The court therefore concludes that plaintiffs have failed to demonstrate a pattern or practice of allegedly discriminatory testing. Moreover, they have established no disparate impact as to either the educational requirements of the testing in the event they are found to exist. *See Albemarle Paper Co., supra.*

*Promotions to Supervisory Positions*

At trial, both the Commission and private plaintiffs presented testimony concerning promotions to salaried positions, particularly supervisory positions. Before considering this evidence, the court must resolve

Anaconda's contention that the scope of this action should be limited to claims related to hourly paid job classifications and should not include any claims related to the filling of salaried vacancies since the Commission, among other things, failed to conciliate these issues.

The charges of discrimination filed by plaintiffs Harris and Hillman state, in regard to promotions, "I have worked for this company almost fourteen years, and I have always been held back because of my race." The Commission contends that its resulting investigation and reasonable cause determination were concerned with racial discrimination in promotions generally and were not limited to promotions to hourly jobs. It states that on or about October 30, 1970 it issued and served upon Anaconda its "Regional Director's Findings of Fact" which included the following:

Promotional Opportunities

Witness A (Negro) applied for an opening as an accountant and feels he did not receive proper consideration for the opening.

. . . . .

Witness C (Negro) states "there are a lot of things the black man has to go through in order to qualify for a specific job classification." Yes, Negroes have advanced to supervisory petitions [sic] but he feels it is more or less "window-dressing" in his opinion and is only a token gesture.

. . . . .

The conditions stated above tend to deny to Negro employees promotional opportunities which are open to Caucasians.

Between February 6, 1973 and July 19, 1974, the Commission endeavored to eliminate the alleged unlawful employment practices by informal methods of conference, conciliation, and persuasion but was unable to secure a conciliation agreement acceptable to it. The Commission therefore contends that Anaconda had an opportunity to conciliate with it on the issue of promotions generally and that whether actual negotiations occurred with regard to the narrow issue of promotions to salaried jobs is irrelevant. It believes the important fact to be that the Commission gave Anaconda an opportunity to negotiate a "conciliation agreement acceptable to the Commission" within the meaning of Section 706(f)(1) of Title VII, 42 U.S.C. § 2000e–5(f)(1).

The law is clear that the Commission may not litigate items of alleged discrimination which were not included in its investigation, fact findings, and conciliation efforts. As stated by the court in *EEOC v. General Electric Co.*, 532 F.2d 359, 366 (4th Cir. 1976):

In other words, the original charge is sufficient to support the action by the EEOC as well as a civil suit under the Act for any discrimination stated in the charge itself or developed in the course of a reasonable investigation of that charge, provided such discrimination was included in the reasonable cause determination of the EEOC and was followed by compliance with the conciliation procedures fixed in the Act.

(Emphasis omitted.)

In *EEOC v. Sherwood Medical Industries*, 17 F.E.P. 441 (N.D.Fla.1978), the court discussed this issue at length and held that because a reasonable cause determination and an effort to conciliate are statutory prerequisites to the Commission's right to sue, only the *specific* issues encompassed therein can be raised by the Commission in a civil action.

[E]very decision recognizing the right in the Commission to expand its investigation—and ultimately its judicial complaint—beyond the scope of the charging party's charge, has presupposed that the additional employment practices complained of were included in the conciliation attempt along with the original charge. . . .

The only construction of the statute which is at all in harmony with the Congressional desire for conciliation is that the Commission's authority to sue is conditioned upon full compliance with the administrative process—investigation, determination, and conciliation—with re-

spect to each discriminatory practice alleged. "Congress, committed as it was to voluntary compliance, could not have intended that the Commission could attempt conciliation on one set of issues and, having failed, litigate a different set." *EEOC v. E. I. DuPont de Nemours and Company,* [373 F.Supp. 1321, 1336 (D.Del.1974)]. . . .
*Id.* at 445. *See, e. g., EEOC v. Federated Mutual Insurance Co.,* 16 F.E.P. 820 (N.D. Ga.1976) (O'Kelley, J.); *EEOC v. Brown Transport Corp.,* 15 F.E.P. 1063 (N.D.Ga. 1976) (Hill, J.); *EEOC v. Griffin Wheel Co.,* 12 F.E.P. 523 (N.D.Ala.1976).

█ An examination of the Regional Director's Findings of Fact, the Commission's Determination, and, especially, its proposed conciliation agreement in the present case, reveals that, with the exception of the witness statements quoted above, the Commission's involvement through the process of investigation, determination, and conciliation was limited to issues relating to the bargaining unit. Further, while it argues that it has met its burden to conciliate, the Commission does so in language which makes clear that conciliation on promotions to supervisory positions did not occur. Accordingly, under the existing law, the court concludes that the Commission is barred from now raising the issue of discriminatory promotions to supervisory positions.

█ This does not resolve the question completely, however, since the scope of a private plaintiff's suit is not limited by the Commission's failure to conciliate as to a particular claim. It is well-established that the scope of a private civil action under Title VII is limited only by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge. *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455 (5th Cir. 1970). In *Gamble v. Birmingham & Southern R. R.,* 514 F.2d 678, 688 (5th Cir. 1975), a charge alleging "I was not allowed to promote to conductor" was held to be sufficiently like or related to an allegation in the charging party's complaint that he had been denied promotion to a supervisory position to allow the plaintiff to

pursue the latter allegation, notwithstanding that the Commission had neither investigated nor attempted conciliation on the issue.

Anaconda admits that plaintiffs Harris and Hillman would have been able to raise the supervisory issue in this lawsuit on the basis of the statements in their original EEOC charges that they had "always been held back" in terms of promotions because of their race, in view of the company's "promotion from within" policy. It contends, however, that plaintiffs' failure to raise this issue specifically in their complaint must now prevent its consideration by this court. In addition, they note that in response to interrogatories served by Anaconda on plaintiffs, plaintiffs never complained of discrimination in promotions to salaried or supervisory positions. It appears that this issue was first specifically raised in pleadings by the private plaintiffs in the Pre-trial Order, filed in 1978. Anaconda therefore argues that as a result of plaintiffs' delay in raising the supervisory question and undue prejudice to the company, the doctrine of laches should preclude them from now seeking to litigate the issue. *See* text, *supra,* at 20.

█ Under normal circumstances the court would agree. Here, however, there are extenuating factors which require a finding that the test for laches has not been met. Although plaintiffs have engaged in an unreasonable delay in specifically addressing this issue in their pleadings, the court cannot conclude that Anaconda has been prejudiced as a result of the delay. It admits in its briefs that it became aware during depositions and other discovery in 1976 that promotions to supervisory or salaried positions were involved in this action, and yet at no time did it seek to have such matters dismissed from the case. Neither did it, upon receipt of the pre-trial order, attempt to obtain a continuance of the trial to enable it to prepare itself for a new attack. The conduct of the trial makes clear why no such motions were presented; the company was well-prepared to address this question, both through the testimony of

witnesses and statistical evidence, and had suffered no prejudice from the lapsed time. Accordingly, the court concludes that the individual plaintiffs are not barred by laches from litigating the question of discrimination in promotions to supervisory or salaried jobs in connection with their individual claims or on behalf of the class which they represent. The court will therefore consider the merits of this allegation.

At all times relevant to this suit, Anaconda has had a policy of "promotion from within." As provided in a "Personnel Policies Practices" statement:

> The Company intends to afford each employee every opportunity for advancement consistent with individual ability and interest, and to insure that each employee is working in the job for which he or she is best suited. When personnel vacancies occur, it is the policy to promote from within, provided qualified individuals are available to meet the requirements of the vacant positions.

As noted earlier, at all relevant times Amarlite Anaconda has been organized into between six and eight overall departments or work functions under a Vice-President/General Manager. Each of these units is headed by a department manager. One of these department managers, the director of manufacturing, supervises various production managers. Ultimately, the department managers determine whether there is a vacancy in a salaried position in their department. In the manufacturing department, for example, the established procedure requires that the production manager in the area where the vacancy exists fill out a personnel requisition form and submit it to the Employee Relations Department where job descriptions for all salaried jobs are on file. These job descriptions have been prepared previously by the various production managers, and, according to the company, this demonstrates that the manager filling out a requisition is familiar with the requirements of the job in question. Once the Employee Relations Department receives a requisition form, it con-

ducts a search of its personnel files to find qualified candidates to present to the requesting manager. These candidates are then interviewed by that manager and the Employee Relations Manager and a selection is made. Testimony at trial indicated that in practice when the production manager determines that a need for an additional production foreman exists, he discusses with the area foremen working under him which hourly employees have the qualifications for the position. These area foremen or superintendents then discuss with the first line production foreman their recommendations, if any. Thus, several people are involved in the selection process. It appears that a favorable recommendation from the employee's immediate supervisor is of some importance in the process.

The evidence revealed that these procedures were not always rigidly adhered to. It is unclear from the records how often the personnel requisition forms were actually employed prior to 1974. Moreover, prior to 1978, Anaconda did not regularly post notice of all salaried vacancies; an hourly employee who was interested in a promotion to a salaried position could manifest this interest to his foreman, who might later interview that employee when a vacancy developed. Neither does Anaconda provide its managers with specific and objective guidelines, written or oral, to be used in determining which employees are qualified for promotion. Finally, because it has no regular policy regarding the preparation of evaluations of its hourly employees' performance, Anaconda relies on its managers' memories and oral communications to evaluate past performance of employees when those employees are being considered for promotions.

Plaintiffs contend that the foregoing facially neutral practices and procedures operate in a racially discriminatory manner to preclude black employees from promotions to management positions. They therefore appear to rely upon a theory of "disparate impact."[20] *See Teamsters, su-*

---

**20.** Very few black employees testified about their attempts to obtain salaried or supervisory positions, and certain of what limited testimony there was—either because of the date or the

*pra*, at 335, n.15, 97 S.Ct. 1843. As noted earlier, although the party relying upon an impact theory need not prove discriminatory motive, as is necessary under a discriminatory treatment theory, he must at least prove that the challenged practice does in fact have a substantial adverse impact on a protected group. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *Griggs v. Duke Power Co.*, 401 U.S. 424, 426, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Subjective methodology in and of itself does not violate Title VII. *See Hester v. Southern Ry.*, 497 F.2d 1374, 1381 (5th Cir. 1974).

To this end the parties have introduced the following statistical evidence demonstrating the racial composition of all supervisory and salaried jobs by general category at certain points in time.

| Job Categories | June 1, 1969 | | | March 31, 1977 | | | April 1, 1978 | | |
|---|---|---|---|---|---|---|---|---|---|
| | All Employees | Black Employees | | All Employees | Black Employees | | All Employees | Black Employees | |
| | Number | No. | % | Number | No. | % | Number | No. | % |
| Officials & Managers | 56 | 1 | 1.8% | 68 | 4 | 5.9% | 81 | 7 | 8.6% |
| Professionals | 16 | 0 | 0 % | 14 | 0 | 0 % | 14 | 2 | 14.3% |
| Technicians | 18 | 2 | 11.1% | 24 | 3 | 12.5% | 28 | 4 | 14.3% |
| Sales | 14 | 0 | 0 % | 17 | 0 | 0 % | 10 | 0 | 0 % |
| Office & Clerical | 33 | 5 | 15.2% | 39 | 11 | 20.2% | 40 | 10 | 25.0% |
| TOTALS | 137 | 8 | 5.8% | 162 | 18 | 11.1% | 173 | 23 | 13.2% |
| Total Black Population In Plant | 462 | 161 | 34.8% | 420 | 110 | 26.2% | 512 | 157 | 30.7% |

Plaintiffs contend that a comparison of the percentage of black employees in each category to the total black employee percentage in the plant as of each date is appropriate. All but five supervisory employees are included within the "officials and managers" category. A comparison for this group shows that in 1969 Anaconda had only one black supervisor, or 1.8% of those positions, although the plant had a 34.8% black population. Further, in early 1977, the company had only four black supervisors, representing 5.9% of supervisory employees, although the percentage of all black employees was 26.2%. One year later—although plaintiffs contend the court should not consider these statistics—8.6% of the supervisory positions (seven individuals) were filled by blacks, compared to a 30.7% black population in the plant. Similarly, on June 1, 1969, only 5.8% of *all* salaried and supervisory positions were filled by blacks although the black plant population at that time was 34.8%. In early 1977, black employees filled 11.1% of these jobs but constituted 26.2% of the plant work force; the figures for 1978 demonstrate that blacks filled 13.2% of all salaried positions while comprising 30.7% of the entire plant population.

Relying on *Teamsters, supra,* and *Hazelwood School District v. United States*, 433 U.S. 299, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977), Anaconda asserts that a comparison of this sort is inappropriate in this case and does not accurately demonstrate whether the practices in question are discriminatory. In *Teamsters* the Supreme Court noted that:

An employer might show, for example, that the claimed discriminatory pattern is

witnesses' credibility—was not probative. Even accepting all of the statements as true, however, plaintiffs would not have demonstrated a pattern or practice of purposeful discrimination such that it proved a prima facie case of class-wide disparate treatment.

a product of pre-Act hiring rather than unlawful post-Act discrimination, or that during the period it is alleged to have pursued a discriminatory policy it made too few employment decisions to justify the inference that it had engaged in a regular practice of discrimination.

431 U.S. at 360, 97 S.Ct. at 1867. In *Hazelwood,* referring to this language, the Court stated, "A public employer who from that date forward [the effective date of the act as to it] made all its employment decisions in a wholly nondiscriminatory way would not violate Title VII even if it had formerly maintained an all-white workforce by purposefully excluding Negroes." 433 U.S. at 309, 97 S.Ct. at 2742. It therefore analyzed the percentage of blacks hired as teachers in each of the two years within the relevant time period and computed the percentage over the entire two-year period. The Court then compared this overall hiring percentage (3.7%) to the percentage of Negro teachers in the relevant labor market. *See* 433 U.S. at 310, 97 S.Ct. 2736.

A comparable analysis was undertaken in *Swint v. Pullman-Standard,* 15 F.E.P. 144 (N.D.Ala.1977), a case involving promotions to supervisors in a manufacturing plant. There, noting that at the time of trial only 10% of the supervisors were black, the court found that such a statistic could be the result of pre-Act discrimination and could be rebutted by data pertinent to the employment decisions made during the period covered under the EEOC charge. *Id.* at 150. It then summarized the number and percentage of supervisory promotions going to blacks in the relevant time period. As is true here, this time period went from ninety days prior to the filing of the operative EEOC charge forward. *See id.* at 146. During this time period, a total of seventy-five promotions were made, of which 24% went to black employees. The court then used this figure for its comparisons, rather than the percentage of black supervisors at the time of trial.

Anaconda has presented, through the testimony of Joseph Diehl, the Employee Relations Manager, evidence which enables this court to trace the promotions of bargaining unit employees to supervisory and salaried positions from 1966 on.[21] Accordingly, the court concludes that the approach suggested in *Hazelwood* and applied in *Swint* is the most appropriate. Since we are dealing with the question of promotions from bargaining unit positions to supervisory and salaried positions, the percentage of minorities holding a particular position at any time is substantially less probative than the percentage of qualified minorities filling vacancies during the relevant period, when such data is available. Mr. Diehl's testimony is set forth in chart form below.

| Year | Promotions | White No. (Percent) | Black No. (Percent) |
|---|---|---|---|
| 1966 | 0 | 0 | 0 |
| 1967 | 1 | 1 (100%) | 0 (0%) |
| 1968 | 5 | 5 (100%) | 0 (0%) |
| 1969 | 3 | 2 (67%) | 1 (33%) |
| 1970 | 1 | 1 (100%) | 0 (0%) |
| 1971 | 0 | 0 | 0 |
| 1972 | 1 | 1 (100%) | 0 (0%) |
| 1973 | 3 | 2 (67%) | 1 (33%) |
| 1974 | 1 | 1 (100%) | 0 (0%) |
| 1975 | 0 | 0 | 0 |
| 1976 | 0 | 0 | 0 |
| 1977 | 5 | 2 (40%) | 3 (60%) |
| Total All Years (1966–77) | 20 | 15 (75%) | 5 (25%) |
| Total (1966–77) | 14 | 9 (64%) | 5 (36%) |

■ This chart reveals that for the years 1966–77, five, or 25%, of the twenty supervisory promotions awarded to bargaining unit employees went to black workers. From 1969 to 1977, the relevant time period in this case, it appears that black employees received 36% of the promotions, that is, five of the fourteen openings. Dr. Jewell's testimony, discussed earlier in this order, es-

**21.** The company's records do not go back before this date.

tablished that the weighted average black population of the bargaining unit from 1967 to 1977 was 36.9%. A comparison of the latter two percentages reveals that the existing selection procedures for supervisors have no disparate impact upon black workers.[22]

Mr. Diehl also testified concerning the numbers of promotions to both salaried and supervisory positions [23] from the bargaining unit from 1966 to 1977. These statistics are as follows:

| Year | Promotions | White No. (Percent) | Black No. (Percent) |
|------|-----------|---------------------|---------------------|
| 1966 | 5 | 5 (100%) | 0 (0%) |
| 1967 | 2 | 2 (100%) | 0 (0%) |
| 1968 | 15 | 13 (86.7%) | 2 (13.3%) |
| 1969 | 4 | 2 (50%) | 2 (50%) |
| 1970 | 2 | 2 (100%) | 0 (0%) |
| 1971 | 1 | 1 (100%) | 0 (0%) |
| 1972 | 2 | 1 (50%) | 1 (50%) |
| 1973 | 6 | 5 (83.3%) | 1 (16.7%) |
| 1974 | 4 | 4 (100%) | 0 (0%) |
| 1975 | 0 | 0 | 0 |
| 1976 | 1 | 0 (0%) | 1 (100%) |
| 1977 | 9 | 4 (44.4%) | 5 (55.6%) |
| Total All Years (1966–77) | 51 | 39 (76.5%) | 12 (23.5%) |
| Total (1969–77) | 29 | 19 (65.5%) | 10 (34.5%) |

Again, any inference of disparate impact has been rebutted. From 1969 to 1977, black bargaining unit employees obtained 34.5% of the awarded promotions, and this figure compares favorably with the aforementioned weighted black average of 36.9%.

Plaintiffs do not appear to object to the court's use of such a comparison in general. They contend, however, that any promotions made during 1977 ought to be discounted since "[a]ctions taken in the face of litigation are equivocal in purpose, motive and permanence." *James v. Stockham Valves & Fittings Co.,* 559 F.2d 310, 325, n. 18 (5th Cir. 1977). But *James* does not hold that all action taken after a lawsuit is filed must be disregarded. Instead, it indicates that the pattern of improvement in promotions should be judged in light of the "equivocal" nature of the recent promotions. As stated in *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1204 (5th Cir. 1978), "The [District] court's finding that there are [12] additional blacks in the supervisor positions, while relevant to the ultimate question of whether blacks had been discriminated against by the use of subjective selection criteria, is not determinative of the issue." In *Pettway,* the court cited *Swint v. Pullman-Standard,* 539 F.2d 77 (5th Cir. 1976), which considered the fact that between 1971, when the lawsuit was filed,[24] and 1974, the date of trial, eight of twenty foremen appointed were black. In *Swint,* the Fifth Circuit stated, "This figure is clearly indicative of the lack of discrimination in promotion. It is appropriate to consider it as counterbalancing evidence of the statistics indicative of discrimination which were presented by the plaintiffs."

22. Anaconda has strenuously asserted that the positions in question require special qualifications not possessed by bargaining unit personnel as a whole and that therefore the court should not compare the company's promotional statistics to the percentage of blacks employed in the plant as a whole. Instead, it suggests that the proper comparison would be to availability statistics furnished by the Office of Federal Contract Compliance and the Georgia Department of Labor, based on United States Census data, which indicate the actual minority participation in the work force in the Atlanta SMSA in each of the EEO-1 job categories at various points in time. In certain situations, such a measure might be appropriate. In view of Anaconda's "promotion from within" policy, the somewhat nebulous "special skills" the company believes necessary for these upper level jobs and the fact that there are no precise jobs an employee must have before becoming a supervisor or salaried employee, the court declines to adopt such an approach.

23. These figures include those previously discussed for supervisory positions alone.

24. *Swint v. Pullman Standard,* 11 FEP 943 (N.D.Ala.1974), indicates that the civil action number of this case was 71–955–S, showing it was filed in 1971. Thus, the very "recent promotion statistics" which the Fifth Circuit di-

539 F.2d at 104. Although it objected to other reasons advanced by the lower court for its finding in favor of the defendant, the appellate court found, based in part on the "dramatic improvement in black promotions to salaried supervisor," that the evidence did not make out a prima facie case. The court therefore remanded the action to the district court "to balance *recent [post-lawsuit] promotion statistics* and black turn-downs against the overall statistics presented by the plaintiffs." *Id.* at 105. Thus, it is clear that the 1977 figures are entitled to consideration in this action.[25] As noted earlier, the court concludes that Anaconda has rebutted any inference of disparate impact in relation to its promotional procedures for supervisory and salaried jobs.[26]

■ Plaintiffs also complained that Anaconda employs discriminatory tests and minimum educational requirements which have excluded a disproportionately high percentage of the company's black employees from supervisory or salaried positions. The evidence supports neither proposition. A copy of a test entitled "How Supervise?" appears in one personnel file and a Martin "Skil-Chart" in another. Both of these tests occurred before 1969, and furthermore, there is no indication that they were given in more than a few instances. In any

event, both individuals who took these tests are white.

With regard to their contention that educational requirements exist for foreman positions, plaintiffs rely upon examples of personnel requisition forms which contain the words "High School", "College", and "Degree Desired" with black lines provided after each so that the requisitioning manager can specify what minimum educational level is required. They have offered only one completed form which supports their position at all, however, and that is the personnel requisition for the Maintenance Foreman position filled in 1977. Initially, the court notes that although the box for high school is checked, the words "or equiv[alent]" are written in after it, thus indicating that a high school diploma is not a requirement. Moreover, the individual who ultimately filled that position was Robert Raines, a black employee. Plaintiffs have come forward with no other evidence that such requirements were used, and the testimony indicates that while management wanted some evidence of basic technical skills, there was no minimum level of general education for supervisory jobs. This is borne out by the number of employees who currently hold such positions who lack high school diplomas. Finally, even had plaintiffs established that tests or educational standards were used as a matter of course,

rected the district court to consider were based on figures between 1971 and 1974, *i. e.,* the *time period* between the filing of the action and the trial.

**25.** The court would have been more inclined to view these later promotions with a questioning eye had the promotional pattern been somewhat different. For example, had Anaconda continued to promote white employees and failed to advance black workers *until* 1977, the court would have viewed the promotions with a large measure of skepticism. Here, although plaintiffs attempted to categorize these promotions as sudden and trial-oriented, a review of the evidence reveals that for purely supervisory positions, no promotions—blacks or whites—were made in either 1975 of 1976, and that for all salaried positions, no promotions occurred in 1975 and only one employee—black—was promoted in 1976. These figures are in keeping

with the testimony at trial that Anaconda engaged in personnel cutbacks beginning sometime in 1975.

**26.** In so holding, the court in no way means to place its stamp of approval on the procedures utilized by Anaconda. In fact, those procedures appear to include certain factors denounced in *Rowe v. General Motors Corp.,* 457 F.2d 348, 358 (5th Cir. 1972). Specifically, the foreman's recommendation appears to carry substantial weight and foremen are given no written instructions pertaining to the qualifications necessary for promotion. Moreover, while job descriptions do exist, it is unclear whether they are ever used or referred to during the selection process. Anaconda may find itself in some difficulty if the percentage of black employees promoted to salaried or supervisory positions drops.

they have failed to prove any disparate impact from such practices, as required by *Albemarle Paper, supra.*

### Individual Claims

 In a non-class claim of employment discrimination under Title VII, the plaintiff carries the initial burden of proving a prima facie case of discrimination. The elements of a prima facie case, delineated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), are (1) that the complainant must belong to a protected minority; (2) that he must apply and be qualified for a job for which the employer is seeking applications; (3) that he must be rejected for the job; and (4) that the employer must then continue to seek applicants with the complainant's qualifications. When a plaintiff meets these criteria, the burden shifts to the defendant to show, by a preponderance of the evidence, that it had legitimate, nondiscriminatory reasons for its decision. If the defendant can meet this burden, the plaintiff must then prove, by a preponderance of the evidence, that the articulated reason is a pretext for discrimination. The court will now examine the claims raised by the individual plaintiffs in accordance with this test. While statistical evidence is relevant in judging individual allegations of discrimination, *Dothard v. Rawlinson,* 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the court has already concluded that the statistics presented by the Commission and the individual plaintiffs are without probative value. They therefore will not assist plaintiffs here.

### Henry Harris

 Plaintiff Harris was hired by Anaconda's predecessor company on August 18, 1955 and was assigned to the Buffing Department. He is presently employed as a Fabrication Welder Layout Leadman, the top position in the fabrication division and one of the best-paid job classifications in the plant. Harris contends that he was frustrated and held back in his efforts to achieve promotion and that his overall job aspirations were toward tooling or foreman positions. In this regard, he made several types of allegations. First, he charged that certain tryouts he participated in were unfair. Harris complains about a tryout for a job in the storeroom under a foreman named Haught, which he claimed lasted only fifteen minutes. However, on cross-examination, he admitted that he could not remember the date of this tryout and that he did not know whether a white or black employee got the job. Foreman Haught, although not remembering this specific tryout, mentioned three black employees whom he passed on tryouts into this position starting in the early 1960s. This testimony was supported by company records. Thus, Harris has failed to make out a claim concerning this tryout.

The next tryout complained of concerned a job in the mill under a foreman named Woodward. Harris stated that his tryout only lasted about fifteen minutes and that a white employee named Neese got the job after having been temporarily assigned to the position previously. He stated that this tryout occurred sometime after May, 1965. By his own testimony, this tryout was clearly pre-1969, may have been pre-Act, and thus cannot support a finding of liability.

Concerning bids into the Maintenance and Tooling Division, Harris testified that he generally did not receive tryouts on these bids because of the divisional preference. Since the court has determined that the divisional seniority system is protected under section 703(h), the court finds nothing improper in this conduct. In one instance, a bid on a Machinist A job, Harris took a written test along with twelve to fifteen employees, white and black. Two white employees, James Adcock and William Moore, obtained the jobs after passing the written tests and a three-day tryout. Although Harris did not state a date for this occurrence, Adcock testified that it was in 1967, and this date is supported by company records. The statute of limitations therefore bars consideration of this claim as well.

Harris next complains of a tryout for the press brake job which was conducted by

supervisor Dixon and lasted only four hours. He testified that the supervisor said his work was not consistent enough, although it passed inspection. A white employee named Dingler got the job. Harris placed the date of this occurrence as January of 1969, but did not bring it within the relevant time period.

Mr. Harris next cited an April, 1972 layout tryout at the Georgia District (Atlanta Region) warehouse under a white foreman named Harvey Crowe. A white employee named Ray Croy, Jr. got the job, after Harris failed the tryout for failing to put the correct "hand" (left or right) on the doors he laid out. Harris testified that although he did not pass this tryout, he was upgraded to layout three weeks later in the Custom Department. He contended that Anaconda was seeking to keep the Georgia District all white. In rebuttal, Anaconda produced the testimony of the foreman who gave the tryout and a written report he made at the time of the tryout. Crowe testified that the Georgia District had black employees in 1972 and was located next to Fabrication where Harris worked. Crowe's testimony and report demonstrated that in a variety of tasks assigned, Harris was consistently extremely slow in his work, and on several occasions inaccurate. In addition to the lack of knowledge of the "handedness" of the doors, Harris did not understand the operation of the door, the relationship of the door to the frame, or how to read the sales order or operate the layout table. This evidence effectively rebutted any inference of discrimination on this tryout by demonstrating that Harris' failure was based on lack of qualifications at that time.

The second area raised by Harris was that jobs were racially segregated and that he was not allowed to bid into certain positions, such as the Maintenance and Tooling division. He first charged that blacks were not allowed to bid out of the buffing room, but Mr. Harris bid out of the Buffing Department on February 22, 1965, prior to the passage of the Civil Rights Act. His other complaint was that when the Interior Door Department was closed in 1967, he was not allowed to use his seniority to "bump" into

the Maintenance Division. However, this complaint was pursued to arbitration and found wanting as far as the collective bargaining agreement was concerned. Moreover, charges were filed with the EEOC in this regard and were dismissed by the Commission, which found that "charging parties fared no worse than some of their similarly placed white counterparts, and better than others." Harris testified that James Adcock, then union president and chief shop steward, told him he had no right to bid into maintenance. Adcock denied making this statement. This conflict in the testimony is immaterial, since this event took place in 1967.

In summary, the court finds that Harris failed to make out a prima facie case as to any violations of Title VII after January 18, 1969 and that Anaconda demonstrated legitimate, nondiscriminatory reasons for its actions and plaintiff failed to prove that they were pretextual. His work history was that after working in a low-skilled position prior to the passage of the Civil Rights Act, Harris moved into more skilled jobs and moved rapidly forward after obtaining company-provided training in 1968 and 1969. He rapidly progressed in the Custom Division so that he is now in the top position in this section. Although Harris testified that he desired to become a tooling worker or a foreman, he made only one application for a tooling position in 1967. Even if he had met his burden of proving he was qualified for the position, the event was prior to the relevant time period. Further, the absence of more precise testimony about Harris' foreman aspirations (it is not clear if he ever expressed this desire to the company), in view of the court's conclusion that the procedures employed in selecting supervisory employees are not invalid or racially discriminatory, must bar any relief on that score. As to all other alleged violations, the court concludes that Harris has not supported his claims of unlawful activities as to himself under either Title VII or 42 U.S.C. § 1981.

*Johnnie C. Hillman*

Plaintiff Hillman is also a Fabrication Welder Layout Leader, the top hourly

grade in Custom Fabrication. Like Harris, Hillman complained of unfair tryouts. First, he contended that when he tried out for a Machine Operator A position in the mill under foreman Woodward, the material he milled on his tryout was lost. A white employee named Neese obtained the job, and Hillman later replaced Neese temporarily when Neese was sick.[27] Hillman also complained that James Adcock, chief shop steward and union president, refused to agree to a second tryout because it would be unfair to the other employees. Mr. Adcock denies this incident entirely. This conflict is immaterial because Hillman placed the date of this occurrence as 1966 and because the test results of other black employees who tried out were not lost.

Concerning a tryout for Press Brake Operator, Hillman testified that foreman Abercrombie initially rejected him on the tryout because his work was one-sixteenth of an inch off. After a higher supervisor named Bellew spoke to Abercrombie, Abercrombie offered Hillman the job, warning him that he would be fired if he scrapped any material. He therefore turned down the job. Abercrombie did not remember the details of this incident, but testified that he would never reject anyone for so small an error. Hillman conceded on cross-examination that he was scrapped various pieces of material on different jobs without being fired or even warned. He also testified that sometime thereafter in August, 1969 he was promoted to a press brake job in a different division under a different foreman. Considering all this, plus the fact that Hillman did not establish a date for the first tryout [28] and voluntarily rejected the job, the court finds that he has not established an unlawful employment practice in this regard.

Hillman's final allegation of an unfair tryout concerns his unsuccessful tryout in May, 1978 for the position of Millwright in the maintenance area. It should be noted that the Millwright position is the highest rated job classification in the maintenance area, apart from Master Electrician. Under the job description in the collective bargaining agreement and the testimony, a Millwright must be able to diagnose problems with and make repairs on all the machinery in the plant. The union contract provides that a Millwright "must be fully qualified in two or more of the following areas: Hydraulics, refrigeration, pneumatics, automotive, welding." Millwright is not an entry level position. On the contrary, it is the top of a progression from a Maintenance Repairman B to Maintenance Repairman A to Millwright. The testimony established that it took several years as a Maintenance Repairman A to acquire the experience and knowledge necessary to perform the millwright functions.

Under the straight plantwide seniority provisions in the current collective bargaining agreement, Hillman bid on and received a tryout for the Millwright position from May 10 through May 12, 1978, shortly before the trial of this case. The tryout was administered by foreman John Snelling, who completed a "qualification (disqualification) record" on plaintiff's performance. The testimony of Hillman and Snelling was in conflict on most of the aspects of the tryout. One of the tasks was to .chase threads, using a lathe, and the piece of work performed by Hillman was admitted as a physical exhibit. Testimony established that this work was deficient in that the threads were not sufficiently defined. Hillman does not contest the insufficiency of the work, but blames a flaw in the machine. However, Snelling's testimony established that the machine was checked and had no problem. Thus, Hillman failed to establish unfairness in this area. Mr. Hillman was assigned to repair several pieces of machinery which happened to be

---

27. That Hillman was temporarily assigned to a job classification which provided training or experience opportunities undercuts plaintiffs' contentions that "good" temporary assignments were never given to black workers.

28. Plaintiffs' briefs indicate that the first tryout for Press Brake Operator occurred "several years" before August 1, 1969; the court has not been able to pinpoint the date from the testimony or documents.

broken during his tryout. Of these, he was only successful in making a repair to a broken rod in the punch press. He was unsuccessful at all his other repairs: a sludge pump, a tow motor, and a clip saw machine. In all these instances, after Hillman was unable to accomplish the repairs, Snelling found it necessary to send over a qualified Millwright so that the machine could be put back into service within a reasonable time. Hillman was also unsuccessful in welding stainless steel. As in the case of the thread chasing, Hillman does not contest his inability to perform the task, but alleges that other Millwrights cannot weld with stainless steel. Testimony presented by the defendant rebutted this allegation. Finally, Mr. Hillman was generally unsuccessful in answering a series of questions designed to test his knowledge of starting and operating normal maintenance equipment. There is no conflict as to the content of the questions and answers. The conflict arises as to whether Hillman's answers were sufficient. From the testimony of both witnesses, the court finds that he failed to provide full and correct answers to questions requesting information about how to perform certain Millwright tasks.

In sum, Hillman feels that he has shown his ability to perform two or more of the duties required of Millwrights. The contract requires Millwrights to be "fully qualified" in two or more of the specified areas, however. While the court is aware that the tasks to be performed on a Millwright tryout vary depending on the company's needs at the time and that therefore Hillman's performance was not judged against uniform and objective standards, it nevertheless concludes from the evidence that Hillman was not qualified for the job.

This Millwright position was later filled by a white employee named Smith, who had previously been a Millwright. Hillman failed to prove that he was equally qualified to Smith, particularly in light of Snelling's testimony comparing the two tryouts, the evidence of Smith's far superior lathe work, and the qualification/disqualification report of Mr. Smith's tryout.

Hillman, like Harris, also charged that temporary assignments in the custom division after the abolition of the interior door department were distributed discriminatorily. He did not testify as to any specific unfair assignments, however. The court has previously found that the assignments were made on the basis of experience and qualification of the various employees involved and in accordance with the collective bargaining agreement, and it sees no reason to alter that conclusion.

Finally, Hillman complains of discrimination with a promotion he received and then lost, in part, in 1972. In July, 1971, Hillman became a Senior Fabricator in the Window Department. After additional responsibilities were added to his job, although not to the position as a whole, he advised the company of his situation and was advanced to the position of Fabrication Welder Layout Leader in 1972. Two white Layout Welders named Waites and Burnett, both of whom had more seniority than Hillman, objected and threatened to file a grievance because the position filled by Hillman had not been posted for bid and filled in accordance with the collective bargaining agreement. After consultation between the company and the union, Anaconda created a new classification, Senior Fabricator Leadman, for Hillman's benefit. The pay rate for this position was one cent less than that for the two senior white employees; Hillman was thus allowed the maximum possible wage without violating the seniority provisions of the contract. Eventually, in 1977, two Fabrication Welder Layout Leader positions were posted for bid, and Harris and Hillman won the positions over one of the two senior whites, who did not pass his tryout. The court finds it hard to see how this set of events proves racial discrimination against Mr. Hillman. Any "discrimination" by Anaconda was in favor of Hillman. No one attained the job in 1972, and Mr. Hillman was given a 15-cent per hour increase as a Senior Fabricator Leadman. When the jobs were later posted for bid, Harris and Hillman got them. No discrimination is shown.

In sum, Mr. Hillman's testimony, when considered with relevant rebuttal evidence, does not establish any denial of promotional opportunities as to him after January 18, 1969.

*Unions*

The Local Union is the exclusive representative and agent of all the company's production and maintenance employees for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment and other conditions of employment. As such, it can negotiate and enter into binding collective bargaining agreements. As noted earlier, since the Local Union received its charter in 1957, black members have served on each Local Union collective bargaining committee for each contract dating from the initial contract in 1957 to the last contract negotiated in 1977. Two black persons, "Shorty" Slaton and Howard Clifton, were active in the organization of the plant in 1956, and black members and other minority members have held union offices such as Divisional Shop Steward, Assistant Chief Shop Steward, and Chief Shop Steward since at least 1968. Blacks and other minorities have served as members of the Local Union Executive Committee since 1965. In 1970, 1972, and 1974, blacks held a three-to-two majority on this committee, while in May, 1976, blacks obtained a four-to-one majority which continues to date. Since May, 1976, the two top officers of the Local Union—the President and the Business Agent—have been black.

The Local Union has no legal duty or responsibility under the collective bargaining agreement or otherwise to set up or administer the 24-hour tryouts which are supervised by the employer. Unless a post-tryout grievance is filed by an employee who was turned down on his tryout, the Local Union does not become involved in this process at all. The testimony revealed that grievances were, except in isolated instances, processed without regard to the race of the complaining employee. For example, the Local Union processed successful grievances on behalf of at least three members of the class—Lawrence Kent, J. W. Walker, and Eugene Jackson—between 1970 and 1976, while Benny Toler, who is white, was Business Agent.

Prior to 1972, an employee seeking to have his grievance taken to arbitration was required to present his grievance to the general membership at a union meeting. The membership would then determine by a majority vote whether or not the grievance was meritorious and should be taken to arbitration. In 1967, the Local Union voted to arbitrate Anaconda's decision to abolish the Interior Door Department. This grievance, which was ultimately unsuccessful, involved both black and white employees. After 1972, upon request of the grievant, the Executive Committee of the Local Union would determine whether a member's grievance should be taken to arbitration. From 1970 to May 1976, under a white President and a white Business Agent, five grievances were taken to arbitration, and all five were on behalf of black grievants. Since June 1976, ten grievances have been taken to arbitration, approximately half filed by black employees. Neither of the individual plaintiffs ever appeared at any general membership meeting or Executive Committee meeting to solicit the Local Union's support in the processing of their grievances to arbitration.

The International Union was originally formed by the association of various local unions of workers in the iron worker industry. Its locals have approximately 500 contracts in force at this time, and it has a staff of twelve general organizers or staff officers, fifty district representatives and a few special representatives. The International provides assistance to local unions during the negotiation of contracts and the handling of grievances which go to arbitration. Specifically, it supplies local unions with a model contract and, when requested, general organizers will assist in the collective bargaining.

The model contract utilized by the International provides for a straight plantwide seniority system. Since the 1940s, it has been the International's policy to have local

unions seek plantwide seniority. In fact, sometime before the Supreme Court's decision in *Teamsters* was handed down, the International sent its staff officers a directive requiring them to press for the removal of systems which were other than straight plantwide seniority systems. Further, while the International does approve "as to form" contracts negotiated by the locals, the International cannot require certain language or provisions to be removed from or inserted into a contract as negotiated because the local is the certified collective bargaining agent for employees.

It has been the custom of the Local Union to request assistance from the International Union on every collective bargaining agreement it has negotiated with Anaconda. The Local Union has always prepared its own proposal for the negotiations, however. Prior to drafting the final proposal to be presented to Anaconda, the existing contract is read at a union meeting and discussed section by section so that the members have an opportunity to suggest changes. In the initial contract negotiations in 1957, the Local Union followed the International's general policy guidelines and attempted to obtain straight plantwide seniority at the Amarlite facility. In the face of the company's economic reasons for a divisional seniority system—which reasons were consistent with the arguments against plantwide seniority advanced by employers throughout the country—the Local accepted the divisional system. In 1965, portions of the seniority system came under fire during the contract negotiations. At that time, the employees engaged in a strike for six weeks over that and other issues. The strike was ultimately settled when the Local Union and Anaconda agreed to a contract which, among other things, provided for limited use of plantwide seniority. During the contract negoti-

ations for 1968, 1971, and 1974, additional changes were made in the bargaining agreement, but plantwide seniority was not a major issue. In 1977, the parties agreed to complete plantwide seniority.

■ The unions' liability in this action must be based upon either the existence of contractual provisions in the collective bargaining agreements which have a racially adverse impact or some form of active discrimination.[29] Since the court has already concluded that the divisional preference was a protected part of the seniority system under section 703(h) and that the seniority system was bona fide, there can be no liability for allegedly discriminatory provisions contained in the contracts. Even if the court had found that the seniority system was not bona fide, however, it concludes that the unions' roles in negotiating or ratifying collective bargaining agreements containing the improper provisions would not justify a finding of liability in this case. *See generally James v. Stockham Valves & Fittings Co., supra.* From its inception in 1957, the Local Union has been integrated and has had a substantial black membership. Black members have participated on all negotiating committees for collective bargaining agreements and have held leadership positions with the union. In addition, it appears that both the Local Union and the International Union attempted at various times to achieve plantwide seniority. That the workers struck in 1965 indicates that the unions pursued their positions forcefully. The court has seen no evidence which even suggests that either union sought or acquiesced to divisional seniority for racially discriminatory reasons. In fact, when the unions polled the employees on whether they wanted to alter the divisional system, only the workers in the Maintenance and Tooling Division responded, and five of six black employees in that section

---

**29.** Neither union has any contractual responsibility under the collective bargaining agreement or legal responsibility or duty with respect to promotions or transfers of employees from jobs within the bargaining unit to salaried or supervisory non-bargaining unit jobs, *see Rowe, supra,* and liability cannot attach as a result of any of Anaconda's practices in this area.

registered their approval of the divisional preference system.

■ Nor may plaintiffs prevail on their claims that the unions followed a policy or practice of discriminating against black employees in the processing of grievances or in taking grievances to arbitration. On the contrary, apart from "isolated or accidental or sporadic discriminatory acts," *Teamsters, supra*, at 336, 97 S.Ct. at 1855, most of which occurred long before 1969, the evidence indicates that the unions have been as diligent in processing the grievances of black employees as they have those of white workers. The court therefore concludes that plaintiffs have proved no violations by the unions of Title VII, 42 U.S.C. § 1981, or 29 U.S.C. §§ 151, *et seq.*, which would warrant a finding of liability to the class or to the individual plaintiffs in this action.

Consideration of the evidence has led this court to conclude that no systematic, class-wide pattern of discrimination has been shown under any theory. The number of relevant individual instances of discrimination was not sufficient to show a regular pattern, and the relevant statistics rebutted any inference of disparate impact from the various employment practices attacked. Neither of the named plaintiffs has carried his burden of proving discrimination as to himself. Therefore, a judgment must be rendered in favor of the defendants, with each party to bear its own costs.[30]

IT IS SO ORDERED.

## APPENDIX 1

* This table was initially prepared and submitted by Anaconda. The court has verified the information contained herein and therefore ADOPTS the table as its own.

Bargaining Unit Employees by Seniority Divisions

March 1, 1965 [1]

| Division Name and Number | Standard Parts | Custom | Finishing | Maintenance | Shipping & Receiving | Melt-Cast-Extrusion | Quality Control | Panel & Window |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| Total # | 62 | 60 | 116 | 26 | 9 | 41 | 26 | 2 |
| Unknown | 7 | 3 | 29 | 0 | 2 | 1 | 3 | 0 |
| Black | 3 | 8 | 50 | 0 | 1 | 9 | 6 | 2 |
| White | 52 | 49 | 37 | 26 | 6 | 31 | 17 | 0 |
| % Black | 5.5% | 14.0% | 57.5% | 0% | 14.3% | 22.5% | 26.1% | 100% |

1. *Source:* Exhibit J–48. The percentage of black employees is the number of black employees divided by the number of all known employees. E.g., "Standard Parts" has 3 of 55 known employees who were black, or 5.5%. "White" includes Hispanic employees.

December 1, 1967 [2]

| Division Name and Number | Standard Parts | Custom | Finishing | Maintenance | Material Handling | Melt-Cast-Extrusion | Quality Control | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
| Total # | 66 | 83 | 90 | 41 | 37 | 36 | 25 | |
| Unknown | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Black | 8 | 21 | 47 | 7 | 8 | 10 | 7 | |
| White | 58 | 62 | 43 | 34 | 29 | 26 | 18 | |
| % Black | 12.1% | 25.3% | 52.2% | 17.0% | 21.6% | 27.8% | 28.0% | |

2. *Source:* Exhibit J–49.

30. The court notes that the private plaintiffs have filed a motion to defer a ruling on this matter. Having read and considered this motion, the court hereby DENIES the same.

■■■■■■■■■■

■■■■■■

June 1, 1968 [3]

| Division Name and Number | Standard Parts | Custom | Finishing | Maintenance | Material Handling | Melt-Cast-Extrusion | Quality Control | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
| Total # | 47 | 79 | 81 | 43 | 30 | 33 | 20 | |
| Unknown | 5 | 5 | 25 | 5 | 4 | 3 | 1 | |
| Black | 5 | 22 | 42 | 6 | 10 | 6 | 8 | |
| White | 37 | 52 | 14 | 32 | 16 | 24 | 11 | |
| % Black | 11.9% | 29.7% | 75.0% | 15.8% | 38.5% | 20.0% | 42.1% | |

3. *Source:* Exhibit J–50. The black percentage equals the number of blacks divided by the number of blacks plus whites. See Note 1, *supra.*

August 30, 1968 [4]

| Division Name and Number | Maintenance and Tooling | Mill | Fabrication | Material Handling | Inspection | Labor | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | | |
| Total # | 34 | 119 | 118 | 46 | 20 | 17 | | |
| Unknown | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Black | 0 | 54 | 26 | 20 | 6 | 11 | | |
| White | 34 | 65 | 92 | 26 | 14 | 6 | | |
| % Black | 0% | 45.4% | 22.0% | 43.5% | 30.0% | 64.7% | | |

4. *Source:* Exhibit J–51.

September 1, 1970 [5]

| Division Name and Number | Maintenance and Tooling | Mill | Fabrication | Material Handling | Inspection | Labor | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | | |
| Total # | 35 | 101 | 87 | 49 | 18 | 15 | | |
| Unknown | 0 | 0 | 0 | 0 | 0 | 0 | | |
| Black | 0 | 60 | 26 | 26 | 6 | 7 | | |
| White | 35 | 41 | 61 | 23 | 12 | 8 | | |
| % Black | 0% | 59.4% | 29.9% | 53.1% | 33.3% | 46.7% | | |

5. *Source:* Exhibit J–52.

September 10, 1974 [6]

| Division Name and Number | Maintenance and Tooling | Mill | Fabrication | Material Handling | Inspection | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | | | |
| Total # | 41 | 126 | 117 | 73 | 17 | | | |
| Unknown | 0 | 0 | 1 | 0 | 0 | | | |
| Black | 6 | 56 | 39 | 17 | 8 | | | |
| White | 35 | 70 | 77 | 56 | 9 | | | |
| % Black | 14.6% | 44.4% | 33.6% | 23.3% | 47.1% | | | |

6. *Source:* Exhibit J–53. The black percentage in Fabrication equals blacks divided by blacks plus whites. J. Hunter is identified on the last page of J–53 as "white". This is erroneous; on all other exhibits he is identified as "black". *See* J–49 (Division 3, p. 5); J–50 (Division 3, p. 4); J–51 (Division 5, p. 1); J–54 (Division 5, p. 1); and J–55 (Division 2, p. 2). He was therefore counted as "black" in this table.

February 27, 1975 [7]

| Division Name and Number | Maintenance and Tooling | Mill | Fabrication | Material Handling | Inspection | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | | | |
| Total # | 40 | 81 | 110 | 54 | 14 | | | |
| Unknown | 0 | 0 | 0 | 0 | 0 | | | |
| Black | 6 | 48 | 39 | 15 | 5 | | | |
| White | 34 | 33 | 71 | 39 | 9 | | | |
| % Black | 15.0% | 59.3% | 35.5% | 27.8% | 35.7% | | | |

7. *Source:* Exhibit J–54. There are two pages for Division 5, Inspection. The first of these duplicates Exhibit J–55, does not belong here, and was disregarded.

March 28, 1977 [8]

| Division Name and Number | Maintenance and Tooling | Mill | Fabrication | Material Handling | Inspection | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | | | |
| Total # | 39 | 80 | 80 | 56 | 8 | | | |
| Unknown | 0 | 0 | 0 | 0 | 0 | | | |
| Black | 5 | 48 | 31 | 13 | 2 | | | |
| White | 34 | 32 | 49 | 43 | 6 | | | |
| % Black | 12.8% | 60.0% | 38.7% | 23.2% | 25.0% | | | |

8. *Source:* Exhibit J–55. Identification of Hicks and Turk (p. 8) from Exhibit J–54 (p. 1).

August 30, 1977 [9]

| Division Name and Number | Maintenance and Tooling | Mill | Fabrication | Material Handling | Inspection | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | | | |
| Total # | 37 | 119 | 111 | 65 | 10 | | | |
| Unknown | 0 | 0 | 0 | 0 | 0 | | | |
| Black | 2 | 64 | 41 | 28 | 4 | | | |
| White | 35 | 55 | 70 | 37 | 6 | | | |
| % Black | 5.4% | 53.8% | 36.9% | 43.1% | 40.0% | | | |

9. *Source:* Exhibit J 56.

June 23, 1978 [10]

| Division Name and Number | Maintenance and Tooling | Mill | Fabrication | Material Handling | Inspection | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | | | |
| Total # | 41 | 128 | 112 | 52 | 11 | | | |
| Unknown | 0 | 31 | 2 | 12 | 0 | | | |
| Black | 5 | 51 | 44 | 16 | 5 | | | |
| White | 36 | 46 | 66 | 24 | 6 | | | |
| % Black | 12.2% | 52.6% | 40.0% | 40.0% | 45.5% | | | |

**10.** *Source:* Exhibit A–94. Under the current collective bargaining agreement (J–9) effective November, 1977, there are no more seniority divisions. For purposes of comparison, employees were placed by job classifications into the seniority divisions in effect just prior to November, 1977. Only those employees in old Division I were racially identified on Exhibit A–94. To the extent possible, other employees were racially identified for this chart based on prior seniority rosters (J–48 through J–56). This explains the "unknown" employees, who were recent hires not listed and identified on prior seniority rosters. A copy of this modified Exhibit A–94 is attached, indicating the race and seniority division of employees included in the June 23, 1978 table, *supra.*